**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
----------------------------------------------------------------x
                                       :
In re                                  :   Chapter 11 Case No.
                                       :
IWO HOLDINGS, INC., et al.,            :   __-_____(    )
                                       :
        Debtors.                       :   (Jointly Administered)
                                       :
----------------------------------------------------------------x
```

## DISCLOSURE STATEMENT RELATING TO DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
    Debtors In Possession
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

RICHARDS, LAYTON & FINGER, P.A.
Attorneys for Debtors and
    Debtors In Possession
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Dated:  December 1, 2004

**IWO HOLDINGS, INC.**
**901 Lakeshore Drive**
**Lake Charles, LA 70601**

December 1, 2004

To:     Senior Noteholders of IWO Holdings, Inc.:

We deliver to you herewith the attached Disclosure Statement and Ballot so that you may vote to accept or reject the proposed joint chapter 11 plan of reorganization (the "Plan") of IWO Holdings, Inc. ("IWO Holdings") and its wholly owned direct and indirect subsidiaries (collectively, the "Company"). The Company intends to use those votes that are returned to its Voting Agent, Financial Balloting Group LLC, by 5:00 p.m., Eastern Time, on December 29, 2004 to seek approval of the Plan in a chapter 11 reorganization case which the Company intends to commence shortly after that date.

The Plan and its related documents are the product of negotiations over the past several months between the Company and its creditors, including the holders of at least two-thirds of IWO Holdings' senior notes who have agreed to vote to accept the Plan.

The Plan provides for a major financial restructuring. Specifically, the Company's senior secured credit agreement will be repaid in full in cash, from the net proceeds of the issuance of two new series of notes. The holders of IWO Holdings' senior notes will receive 100% of the common stock of the reorganized IWO Holdings, subject to dilution for any equity that may be issued in connection with the offering of the new notes or pursuant to a new management equity incentive plan that may be adopted by the board of directors of the reorganized IWO Holdings following the consummation of the Plan. Holders of secured claims and general unsecured creditors (other than holders of senior notes) will receive the full value of their claims and will be unimpaired. All existing equity interests in IWO Holdings will be canceled and the holders of such interests will not receive a distribution. The Plan also contemplates that IWO Holdings will enter into amendments to its affiliation agreements with Sprint PCS and that IWO Holdings will have new management following consummation of the Plan.

The Company does not have the resources to pay its existing senior debt and its senior notes. By eliminating and restructuring that indebtedness, the financial restructuring represented by the Plan will both improve the Company's financial condition and overall creditworthiness, thereby enhancing the Company's ability to maintain its position in the market.

The Company is seeking your vote on the Plan *prior* to the commencement of its chapter 11 case. By using this "prepackaged chapter 11 reorganization" method, the Company anticipates that its day-to-day business operations will not be impacted, its chapter 11 case will be significantly shortened, and the administration of the case will be simplified and less costly. Please review the attached Disclosure Statement carefully for details about voting, recoveries, the Company and its financial performance, and other relevant matters. The Company has established the following Record Date (for determining who is entitled to vote on the Plan) and deadline for its Voting Agent to receive votes:

RECORD DATE:                              November 24, 2004

DEADLINE FOR THE  COMPANY'S
VOTING AGENT TO RECEIVE VOTES:          December 29, 2004, 5:00 p.m., Eastern Time

Sincerely,

*James J. Loughlin*

James J. Loughlin, Jr.
Chief Restructuring Officer

**THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A PLAN OF REORGANIZATION *BEFORE* THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  BECAUSE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THEIR CHAPTER 11 CASES, IWO HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION AND THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE, AND (ii) CONFIRMING THEIR JOINT PLAN OF REORGANIZATION.**

## DISCLOSURE STATEMENT, DATED DECEMBER 1, 2004

**Solicitation of Votes on the
Prepackaged Joint Plan of Reorganization of**

# IWO HOLDINGS, INC.

**and its wholly owned direct and indirect subsidiaries, Independent Wireless One Corporation and Independent Wireless One Leased Realty Corporation**

**from the holders of outstanding**

## 14% SENIOR NOTES DUE 2011

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION IS 5:00 P.M., EASTERN TIME, ON DECEMBER 29, 2004, UNLESS EXTENDED BY IWO HOLDINGS, INC.**

---

**RECOMMENDATION BY IWO HOLDINGS, INC.**
The Boards of Directors of IWO Holdings, Inc. and each of its wholly owned direct and indirect subsidiaries have unanimously approved the solicitation, the Joint Plan of Reorganization, and the transactions contemplated thereby, and recommend that all creditors whose votes are being solicited submit ballots to accept the Joint Plan of Reorganization.

**HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

**THIS OFFER OF NEW IWO HOLDINGS COMMON STOCK IN EXCHANGE FOR CERTAIN EXISTING CLAIMS AGAINST IWO HOLDINGS, INC. HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. THE ISSUANCE OF SUCH SECURITY UNDER THE PLAN OF REORGANIZATION IS BEING DONE PURSUANT TO THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE. THIS SOLICITATION IS BEING MADE ONLY TO THOSE CREDITORS WHO ARE ACCREDITED INVESTORS AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT.**

**THE NEW IWO HOLDINGS COMMON STOCK TO BE ISSUED ON THE CONSUMMATION DATE HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE JOINT PLAN OF REORGANIZATION. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE JOINT PLAN OF REORGANIZATION GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

# INTRODUCTION

## IMPORTANT — PLEASE READ

IWO Holdings, Inc. ("IWO Holdings") and its subsidiaries, Independent Wireless One Corporation ("IWO Corp.") and Independent Wireless One Leased Realty Corporation ("IWO Realty" and, collectively, with IWO Holdings and IWO Corp., "IWO" or the "Debtors"), are soliciting acceptances of the "prepackaged" chapter 11 joint plan of reorganization (the "Plan of Reorganization") attached as Exhibit 1 to this Disclosure Statement.  This solicitation is being conducted at this time in order to obtain sufficient votes to enable the Plan of Reorganization to be confirmed by the Bankruptcy Court.  Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to such terms in the Plan of Reorganization.

WHO IS ENTITLED TO VOTE:  The holders of Senior Note Claims are entitled to vote on the Plan of Reorganization.  The holders of Old Common Stock Interests are deemed to reject the Plan of Reorganization and are not entitled to vote to accept or reject the Plan of Reorganization.  Holders of (i) Secured Credit Agreement Claims, (ii) General Unsecured Claims, (iii) Other Secured Claims and (iv) Priority Non-Tax Claims are deemed to accept the Plan of Reorganization and are not entitled to vote to accept or reject the Plan of Reorganization.  The solicitation to holders of Senior Note Claims is being made only to those creditors who are accredited investors as defined in Regulation D under the Securities Act.

The Debtors are commencing this solicitation after extensive discussions with the steering committee (the "Steering Committee of Lenders") of IWO's Senior Lenders (the "Lenders") and the Ad Hoc Committee of Senior Noteholders (the "Senior Noteholder Committee"), which represents the holders of a majority of the Senior Note Claims.  JPMorgan Chase Bank, the Administrative Agent of the Lenders (the "Agent"), is represented by Wachtell, Lipton, Rosen & Katz, as legal advisors, and FTI Consulting, Inc., as financial advisors.  The Senior Noteholder Committee is represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal advisors, and Chanin Capital Partners, as financial advisors.  IWO has entered into the Lock Up Agreement, dated as of November 29, 2004 (the "Lock Up Agreement"), with the members of the Senior Noteholder Committee who collectively beneficially own approximately 68% of the outstanding Senior Notes.  Pursuant to the terms and conditions of the Lock Up Agreement, and subject to the approval of the Disclosure Statement by the Bankruptcy Court, each of the holders of Senior Notes party thereto has agreed to vote to accept the Plan of Reorganization.  The Lock Up Agreement is attached as Exhibit 2 to this Disclosure Statement.

The Debtors' legal advisors are Weil, Gotshal & Manges LLP and their financial advisors are Evercore Restructuring, L.P.  They can be contacted at:

| | |
|---|---|
| Weil, Gotshal & Manges LLP | Evercore Restructuring, L.P. |
| 767 Fifth Avenue | 55 East 52nd Street, 43rd Floor |
| New York, NY  10153 | New York, NY  10055 |
| (212) 310-8000 | (212) 857-3100 |
| Attn:  Jeffrey L. Tanenbaum, Esq. | Attn:   Craig T. Moore |
| | Eugene Lee |

The following table summarizes the treatment for creditors and stockholders under the Plan of Reorganization.  For a complete explanation, please refer to the discussion in Section IV below, entitled "THE PLAN OF REORGANIZATION", and to the Plan of Reorganization itself.

| Class | Description | Treatment | Estimated Recovery |
|-------|-------------|-----------|--------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | 100% |
| 2 | Secured Credit Agreement Claims | Unimpaired | 100% |
| 3 | Other Secured Claims | Unimpaired | 100% |
| 4 | Senior Note Claims | Impaired | 47%[1] |
| 5 | General Unsecured Claims | Unimpaired | 100% |
| 6 | Old Common Stock Interests | Impaired | NONE |

In connection with the Plan of Reorganization, IWO Escrow Company, a newly-formed Delaware corporation which will be merged with and into IWO Holdings upon consummation of the Plan of Reorganization, will be issuing $225 million in aggregate proceeds of new notes in two series, the proceeds of which will be used to pay in full in cash the Secured Credit Agreement Claims.  Upon consummation of the Plan of Reorganization, the Senior Note Claims will be exchanged for 100% of the New Common Stock of Reorganized IWO Holdings, subject to dilution by any equity of Reorganized IWO Holdings that may be issued in connection with the New Notes Offering or pursuant to a management equity incentive plan which may be adopted by the board of directors of Reorganized IWO Holdings following the Consummation Date, which will be substantially in the form to be annexed to the Plan of Reorganization Supplement (such incentive plan is referred to as the "Management Incentive Plan"). General Unsecured Claims will be unimpaired and the existing Common Stock of IWO

---

[1] Estimated recovery is based upon an $85 million assumed equity reorganization value for the Debtors and Senior Note Claims comprised of $181.5 million of principal and accrued and unpaid interest as of December 31, 2004, and does not reflect any equity that may be issued in connection with the New Notes Offering or pursuant to the Management Incentive Plan.

Holdings will be cancelled.  See Section IV hereof, entitled "THE PLAN OF REORGANIZATION", for a more detailed discussion of the Plan of Reorganization.

For detailed historical and projected financial information and financial estimates, see Section V below, entitled "PROJECTIONS AND VALUATION ANALYSIS."  ADDITIONAL FINANCIAL INFORMATION IS CONTAINED IN IWO HOLDINGS' MOST RECENT ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2003 AND QUARTERLY REPORT ON FORM 10-Q FOR THE PERIOD ENDED SEPTEMBER 30, 2004 ATTACHED AS EXHIBITS 3 AND 4, RESPECTIVELY, TO THIS DISCLOSURE STATEMENT.

**Summary of Voting Procedures**

To be counted your vote (or the Master Ballot cast on your behalf) must be received, pursuant to the following instructions, by IWO's Voting Agent at the following address, before the Voting Deadline of 5:00 p.m. (Eastern Time) on December 29, 2004:

FINANCIAL BALLOTING GROUP LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NEW YORK  10017
**ATTN:  IWO BALLOT TABULATION**

TEL.: (646) 282-1800

**IF YOU ARE, AS OF THE NOVEMBER 24, 2004 RECORD DATE, THE OWNER OF SENIOR NOTE CLAIMS (CLASS 4):**

Please complete the information requested on the Ballot, sign, date and indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-addressed postage-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

**If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a "Master Ballot" before the Voting Deadline (5:00 p.m., Eastern Time, December 29, 2004).**

**IF YOU ARE ENTITLED TO VOTE AND YOU HAVE RETURNED YOUR BALLOT BUT FAILED TO INDICATE ON THE BALLOT WHETHER YOU ACCEPT OR REJECT THE PLAN OF REORGANIZATION, SUCH BALLOT WILL NOT BE COUNTED.**

**THE MEMBERS OF THE SENIOR NOTEHOLDER COMMITTEE INTEND TO VOTE IN FAVOR OF THE PLAN OF REORGANIZATION.**

\* \* \*

For detailed voting instructions, see Section VII below, entitled "VOTING PROCEDURES AND REQUIREMENTS", and the instructions on your Ballot.

[ THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY ]

# TABLE OF CONTENTS

**Page**

I.    DESCRIPTION OF THE BUSINESS.................................................................. 1

    A.    GENERAL...................................................................................... 1

    B.    THE DEBTORS' RELATIONSHIP WITH SPRINT PCS ...................... 1

    C.    SELECTED FINANCIAL INFORMATION ........................................... 2

    D.    COMPETITION ............................................................................. 3

    E.    OWNERSHIP OF DEBTORS; MANAGEMENT AGREEMENT .......... 3

    F.    EXISTING COMMON STOCK CANCELLED; NEW COMMON STOCK WILL NOT BE LISTED ............................................... 6

II.    KEY EVENTS LEADING TO THE SOLICITATION AND DECISION TO COMMENCE A VOLUNTARY CHAPTER 11 REORGANIZATION CASE ............................................................................................ 6

    A.    DEBTORS' PRE-PETITION DEBT OBLIGATIONS............................ 6

    B.    EVENTS PRECIPITATING NEGOTIATIONS WITH CREDITORS ................................................................................. 7

    C.    MODIFICATION TO SPRINT AGREEMENTS ................................... 8

    D.    POSSIBLE CONVERSION OF INDEPENDENT WIRELESS ONE CORPORATION INTO A LIMITED LIABILITY COMPANY.................................................................................. 10

    E.    NEW NOTES OFFERING .............................................................. 11

III.    ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE .................... 16

    A.    CHAPTER 11 FINANCING .......................................................... 16

    B.    OPERATIONAL ISSUES AFTER THE PETITION DATE .................. 16

    C.    CONFIRMATION HEARING .......................................................... 17

IV.    THE PLAN OF REORGANIZATION ............................................................ 17

    A.    INTRODUCTION ......................................................................... 17

    B.    SUBSTANTIVE CONSOLIDATION.................................................. 18

    C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION ..................................................................... 19

    D.    SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OF REORGANIZATION ..................................................................... 25

vii

**TABLE OF CONTENTS**
**(continued)**

Page

E.    MEANS OF IMPLEMENTATION OF THE PLAN OF REORGANIZATION ............................ 27

F.    PROVISIONS GOVERNING DISTRIBUTIONS .................................. 30

G.    PROCEDURES FOR TREATING DISPUTED CLAIMS UNDER PLAN OF REORGANIZATION ............................ 33

H.    PROVISIONS GOVERNING EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................ 34

I.    CONDITIONS PRECEDENT TO CONSUMMATION DATE ............. 36

J.    EFFECT OF CONFIRMATION ................................ 37

K.    WAIVER OF CLAIMS ................................ 39

L.    RETENTION OF JURISDICTION ................................ 39

M.    MISCELLANEOUS PROVISIONS ................................ 41

V.    PROJECTIONS AND VALUATION ANALYSIS ............................ 44

A.    CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS ................................ 44

B.    VALUATION ................................ 53

VI.    CERTAIN FACTORS AFFECTING IWO ............................ 57

A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS ................ 57

B.    FACTORS AFFECTING THE VALUE OF THE SECURITIES TO BE ISSUED UNDER THE PLAN OF REORGANIZATION ........ 58

C.    CERTAIN TAX MATTERS ................................ 60

D.    PENDING LITIGATION OR DEMANDS ASSERTING PREPETITION LIABILITY ................................ 60

VII.    VOTING PROCEDURES AND REQUIREMENTS ........................ 60

A.    VOTING DEADLINE ................................ 60

B.    HOLDERS OF CLAIMS ENTITLED TO VOTE ................... 61

C.    VOTE REQUIRED FOR ACCEPTANCE BY A CLASS ............. 61

D.    VOTING PROCEDURES ................................ 62

VIII.    CONFIRMATION OF THE PLAN OF REORGANIZATION ................ 62

A.    CONFIRMATION HEARING ................................ 62

## TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| | B. | REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION | 63 |
| IX. | | FINANCIAL INFORMATION | 72 |
| | A. | GENERAL | 72 |
| | B. | SELECTED FINANCIAL DATA | 73 |
| | C. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL  CONDITION AND RESULTS OF OPERATIONS | 73 |
| | D. | RECENT PERFORMANCE | 73 |
| X. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION | 73 |
| | A. | LIQUIDATION UNDER CHAPTER 7 | 73 |
| | B. | ALTERNATIVE PLAN OF REORGANIZATION | 74 |
| XI. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES  OF THE PLAN OF REORGANIZATION | 74 |
| | A. | CONSEQUENCES TO IWO | 75 |
| | B. | CONSEQUENCES TO HOLDERS OF SENIOR NOTE CLAIMS | 79 |
| | C. | INFORMATION REPORTING AND WITHHOLDING | 81 |
| CONCLUSION | | | 83 |

**TABLE OF CONTENTS**
**(continued)**

**Exhibits to Disclosure Statement**

Exhibit 1       Plan of Reorganization
Exhibit 2       Noteholder Lock Up Agreement
Exhibit 3       Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2003
Exhibit 4       Quarterly Report on Form 10-Q for the Period Ended September 30, 2004
Exhibit 5       Risk Factors Section of Offering Memorandum

# I.

# DESCRIPTION OF THE BUSINESS

## A.     General

IWO is a PCS affiliate of Sprint PCS, the personal communications services division of Sprint Corporation.  IWO has the exclusive right to provide mobile digital wireless personal communications services, or PCS, under the Sprint® and Sprint PCS® brand names at the 1900 MHz frequency band in a territory that includes a total population, or "POPs," of approximately 6.3 million as of September 30, 2004.  IWO's territory covers upstate New York, including the markets of Albany, Syracuse and Ithaca, New Hampshire, other than the Nashua market, Vermont and portions of Massachusetts and Pennsylvania.  As such, IWO's territory is adjacent to the Sprint PCS markets in New York, Boston, Buffalo, Rochester and Hartford.  As a PCS affiliate of Sprint, IWO offers national and local calling plans designed by Sprint PCS.  IWO markets Sprint PCS products and services through a number of distribution outlets located in IWO's territory, comprised of IWO's retail stores, major national distributors including Radio Shack and Best Buy, and IWO's local third-party distributors.  At September 30, 2004, IWO's network covered approximately 4.8 million people in IWO's territory, which is referred to as "covered POPs," and IWO had approximately 231,000 subscribers.

IWO owns and is responsible for building, operating and managing the portion of the Sprint PCS nationwide network located in its territory.  Sprint PCS, along with the PCS affiliates of Sprint, operates the largest 100% digital, nationwide PCS wireless network in the United States.  IWO's portion of the Sprint PCS network is designed to provide a seamless connection with the rest of the nationwide wireless network of Sprint PCS.  Like Sprint PCS, IWO utilizes code division multiple access, or CDMA, technology across IWO's network.

## B.     The Debtors' Relationship with Sprint PCS

The Debtors are parties to long-term agreements with Sprint PCS and are dependent on Sprint PCS for services to their subscribers, such as billing, customer care, cash collections and maintenance of their subscriber accounts receivable balances.  The Debtors rely on Sprint PCS's system of internal controls to capture information such as subscriber minutes of use, long distance, national sales commissions, the time that their subscribers used the network outside the Debtors' service area, and the time that Sprint PCS and other affiliate subscribers use the network within the Debtors' service area.

Among the agreements between Sprint PCS and IWO are (1) the Sprint PCS Management Agreement dated February 9, 1999, (2) the Sprint PCS Services Agreement dated February 9, 1999, (3) the Sprint Trademark and Service Mark License Agreement dated February 9, 1999 and (4) the Sprint Spectrum Trademark and Service Mark License Agreement dated February 9, 1999 (collectively, the "Sprint Agreements").

IWO is dependent on Sprint PCS for a significant portion of its financial information as a result of its contractual relationship with Sprint PCS as a service bureau provider for billing, cash collections and other back office functions, such as customer service. IWO also purchases certain goods and services through Sprint PCS, such as handsets, network maintenance and access to national retail chain sales channels in its markets, where Sprint PCS has negotiated contracts and allows IWO to operate under those contractual arrangements.

As described in subsection II.C below, entitled "Modification to Sprint Agreements," IWO and Sprint PCS have entered into a letter of intent which provides for the settlement of certain disputes between Sprint PCS and IWO and amendments to the Sprint Agreements (the "Sprint Amendments"). The Sprint Amendments will, among other things, implement a simplified pricing plan for certain services that Sprint PCS provides to IWO through 2006 and increase the reciprocal contractual roaming rate IWO receives for providing network services to other Sprint PCS and Sprint PCS affiliate subscribers while traveling in IWO's territory and that IWO pays to Sprint PCS when its subscribers roam onto other networks of Sprint PCS and Sprint PCS affiliates. The Sprint Amendments will be effective on the Consummation Date with the economic terms applied retroactively to November 1, 2004.

## C.    Selected Financial Information

For the twelve months ended September 30, 2004, IWO generated approximately $184.0 million in total revenue and approximately $(14.2) million in Adjusted Operating Loss (adding back fees and expenses related to the restructuring). For the three months ended September 30, 2004, IWO generated approximately $49.5 million in total revenue and $2.8 million in Adjusted Operating Income (adding back fees and expenses related to the restructuring). IWO estimates that if the Sprint Amendments had been effective as of January 1, 2003, IWO's Adjusted Operating Income would have increased by approximately $1.5 million for the year ended December 31, 2003 and $1.3 and $3.2 million, respectively, for the three- and twelve-month periods ended September 30, 2004.

The adjustments to calculate the impact of the Sprint Amendments were made based upon IWO management's interpretation of the fee simplification agreement Sprint PCS entered into with iPCS, Inc. ("iPCS") and discussions with iPCS's accounting personnel that may or may not be correct and may or may not be consistent with the actual terms and conditions of the Sprint Amendments. In addition, in calculating the impact of the Sprint Amendments, (i) IWO management assumed fee simplification rates for CCPU and CPGA (as such terms are defined in subsection II.C.1. below, entitled "Modification to Sprint Agreements – Sprint Amendments") to be $7.25 and $23.00, respectively, and the reciprocal roaming rate to be $0.058 per minute, (ii) certain costs relating to network switch maintenance fees and certain handset expenses (such as carrying costs, obsolescence charges and processing fees) were excluded from or only partially included in the calculations because certain information was not available or could not be quantified, (iii) the historical results of operation contain no adjustments for any historical costs incurred, that may be included in the Sprint Amendments but were not included in

the fee simplification agreement Sprint PCS entered into with iPCS, (iv) assumptions were made in IWO's historical data that reflect changes in Sprint's service bureau rate based upon recent trending that may or may not be reliable, (v) assumptions were made relative to the timing of the accounting for Sprint out-of-period settlements that may or may not be consistent with how these transactions would have been received in the actual period in which they were incurred and (vi) IWO's financial statements were not adjusted for internal costs associated with in-house activations that were performed by US Unwired but are included in the $23.00 per gross add fees under the proposed Sprint Amendments.

**D.      Competition**

        IWO faces significant competition in its service area from a number of competitors.  There are four other national mobile telephony operators that offer service in at least some portion of IWO's service area – Verizon Wireless, Cingular, Nextel and T-Mobile.  In addition, there are many local and regional carriers that offer PCS and cellular services in IWO's service area.  According to the FCC's Ninth Annual Commercial Mobile Services Competition ("CDMR") Report, released September 28, 2004, ". . . 276 million people, or 97 percent of the total U.S. population, live in counties with access to three or more different operators (cellular, broadband PCS and/or digital SMR providers) offering mobile telephone service."

        This competition has resulted in higher subscriber turnover as wireless users move between carriers with more frequency than experienced in prior years. In order to attract new subscribers, IWO has offered steeper discounts on handsets and more generous service plans that include more minutes and/or more anytime minutes and other ancillary enhancements, such as free long distance.  Based upon increased competition, IWO anticipates that market prices for two-way wireless services will continue to decline in the future.  IWO competes to attract and retain subscribers principally on the basis of services and features, the size and location of its service areas, network coverage and reliability, customer care and pricing.  IWO's ability to compete successfully depends, in part, on its ability to anticipate and respond to various competitive factors affecting the industry, including new services that may be introduced, the impact of wireless local number portability, changes in consumer preferences, demographic trends, economic conditions and discount pricing strategies by competitors.

**E.      Ownership of Debtors; Management Agreement**

        1.      Acquisition by US Unwired

        In April 2002, US Unwired Inc. ("US Unwired") acquired IWO Holdings, which resulted in the Debtors becoming wholly-owned subsidiaries of US Unwired.  US Unwired is a Sprint PCS affiliate and provides PCS services and related products to customers in the southeastern United States as part of Sprint PCS's network.  US Unwired's service area, prior to acquiring IWO, consisted of 11.3 million residents in Louisiana, Texas, Florida, Arkansas, Mississippi, Georgia and Alabama.

2.    Management Agreement

Effective April 1, 2004, IWO and US Unwired formalized the existing management arrangement with the execution of a management agreement (the "Management Agreement") engaging US Unwired to oversee, manage and supervise the development and operation of IWO.  Under its terms, the Management Agreement terminates on December 31, 2005, subject to IWO's right to extend the term of the agreement for an additional year; however, either party may terminate the Management Agreement at any time upon thirty (30) days notice, subject to a transition period of up to one hundred twenty (120) days.

The services US Unwired has agreed to provide to IWO under the Management Agreement include:

- marketing of mobile wireless services (and, to the extent determined by IWO's board of directors, other communications services);

- management, tax compliance, accounting and financial reporting services;

- retaining outside auditors for annual audits, and preparing and filing all financial and other reporting required by the SEC;

- regulatory processing, including the preparation and filing of all appropriate regulatory filings, certificates, tariffs and reports that are required by, and participation in any hearings or other proceedings before, local, state and federal governmental regulatory bodies;

- the engineering, design, planning, construction and installation, maintenance and repair (both emergency and routine) and operation of equipment;

- assistance with the development and preparation of budgets, a business plan and personnel requirements, key performance standards, goals and indicators for IWO's business;

- services relating to sales of IWO products and services, including processing orders for service and customer support, except to the extent services are provided by Sprint PCS;

- administering, enforcing and performing all of IWO's agreements related to Sprint PCS and the Sprint PCS Network, including its management agreement with Sprint PCS, the Sprint PCS Services Agreement and any trademark and license agreements;

- negotiating contracts, issuing purchase orders and otherwise entering into agreements on IWO's behalf for the purchase, lease, license or use of such

4

properties, services and rights as may be necessary or desirable in the judgment of US Unwired for IWO's operations;

- supervising, recruiting and training all necessary personnel to be employed by IWO, and determining salaries, wages and benefits for IWO employees;

- administering IWO's employee benefit programs and programs for compliance with applicable laws governing the administration and operation of such plans and programs;

- administering IWO risk management programs, including negotiating the terms of property and casualty insurance and preparing a comprehensive disaster recovery program; and

- working with IWO's Chief Restructuring Officer in connection with the Reorganization.

Under the terms of the Management Agreement, IWO has agreed to reimburse US Unwired for all reasonable out-of-pocket expenses related to the Management Agreement. In addition, IWO has agreed to pay US Unwired an annual management fee of $6.5 million, which may be increased if IWO meets certain performance targets. IWO has also agreed to pay US Unwired a monthly restructuring premium of $100,000 for each month until December 31, 2004 and, after such date, a monthly restructuring premium of $75,000. Upon completion of the Reorganization, IWO will no longer be required to pay this monthly premium to US Unwired.

Upon consummation of the Reorganization, subject to the terms of the Management Agreement, IWO has also agreed to pay US Unwired a restructuring bonus in the amount of $1 million, subject to certain adjustments related to the previous payment of the restructuring premium described above, and a transaction fee equal to 50 basis points of the amount of the net proceeds of any new financing applied towards the repayment of the Secured Credit Agreement. In addition, subject to the terms of the Management Agreement, IWO has agreed to pay US Unwired a termination fee in the amount of $2.5 million.

The Management Agreement, unless previously terminated, will be terminated upon consummation of the Reorganization, and the current directors of IWO and the management team currently provided by US Unwired will be replaced with new directors and a new management team. Upon termination of the Management Agreement, for a period of four months, US Unwired has agreed to cooperate with IWO in order to transition to a new service provider or to newly hired personnel.

3.   Tax Sharing Agreement

US Unwired is the parent of a U.S. federal consolidated group that includes IWO. US Unwired and IWO file a consolidated U.S. federal income tax return. Under the U.S. federal consolidated return rules, IWO generally does not directly pay U.S. federal

income taxes.  Instead, US Unwired remits any tax due with respect to the consolidated group.  To equitably allocate the consolidated federal income tax liabilities of the consolidated group and any similar state and local tax liabilities between IWO and the remainder of the US Unwired group, and to address certain procedural tax matters, IWO and US Unwired intend to enter into a tax sharing agreement as of the Consummation Date.

**F.      Existing Common Stock Cancelled; New Common Stock Will Not Be Listed**

Pursuant to the Plan of Reorganization, IWO Holdings' common stock will be cancelled and the New Common Stock will not be listed on any nationally recognized market or exchange.  Accordingly, no assurance can be given that a holder of New Common Stock will be able to sell such securities in the future or as to the price at which any sale may occur.

**Additional information concerning IWO and its Subsidiaries' financial condition and results of operations is set forth in IWO Holdings' Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and IWO Holdings' Quarterly Report on Form 10-Q for the period ended September 30, 2004, copies of which are annexed as Exhibits 3 and 4, respectively, to this Disclosure Statement.**

**II.**

**KEY EVENTS LEADING TO THE SOLICITATION AND DECISION TO COMMENCE A VOLUNTARY CHAPTER 11 REORGANIZATION CASE**

**A.      Debtors' Pre-Petition Debt Obligations**

1.      <u>IWO Senior Secured Indebtedness</u>

IWO's senior secured indebtedness is governed by the terms of the Secured Credit Agreement dated December 20, 1999, among IWO Corp., the Lenders, the Agent and the other parties thereto (the "Secured Credit Agreement").  The Secured Credit Agreement is collateralized by substantially all of the tangible and intangible assets of IWO, including a pledge of all of the issued and outstanding shares of capital stock of IWO Corp., and repayment is guaranteed by IWO Holdings.  The Secured Credit Agreement provides for a revolving credit and term loan facility, which have been in default since March 2003.  Specifically, IWO has not been in compliance with the restrictive covenants under the Secured Credit Agreement and, from June 2003 through June 2004, IWO failed to make $13.9 million in interest payments (excluding default interest) on its Secured Credit Agreement.  On July 1, 2004, IWO made a payment of $14.7 million in satisfaction of all delinquent interest amounts due on the Secured Credit Agreement through June 30, 2004 and continues to be current in such interest payments. However, since March 31, 2004, IWO has failed to make $8.8 million in principal payments under the Secured Credit Agreement and continues not to be in compliance with its restrictive covenants.  As a result of the failure to make scheduled principal payments and the covenant violations, IWO continues to be in default of the Secured Credit

Agreement.  Borrowings under the Secured Credit Agreement totaled $215.0 million at November 30, 2004, and there are letters of credit in the aggregate amount of $1,611,100 (the "Letters of Credit") issued and outstanding under the Secured Credit Agreement.

       2.    <u>IWO Senior Notes</u>

       In February 2001, IWO Holdings issued $160 million of 14% Senior Notes ("Senior Notes") due January 15, 2011.  Pursuant to the Indenture dated February 2, 2001 relating to the Senior Notes, interest on the Senior Notes is payable semi-annually on January 15 and July 15 of each year.  IWO Corp. is the sole guarantor of the Senior Notes. A portion of the original proceeds of the Senior Notes offering was set aside as restricted cash and used to make the first six scheduled semi-annual interest payments on the Senior Notes through January 2004.  However, on July 15, 2004, IWO Holdings failed to make a scheduled interest payment of $11.2 million on the Senior Notes.  In contemplation of IWO's failure to make such interest payment, IWO entered into an agreement with the Senior Noteholder Committee on June 22, 2004 (the "Forbearance Agreement"), pursuant to which certain members of the Senior Noteholder Committee agreed, under certain circumstances, to not take any action to enforce their rights, including accelerating the principal amount of the Senior Notes resulting from IWO's failure to make the July 15, 2004 interest payment.  The Forbearance Agreement has been amended from time to time to extend the term of such agreement.

**B.**     **Events Precipitating Negotiations With Creditors**

       Due to IWO's lower than projected revenues, the highly competitive nature of the personal communication service industry and significant capital expenditure requirements, it became readily apparent to IWO that a major deleveraging of IWO's balance sheet was required in order for IWO to compete successfully on a going forward basis.  In early 2003, in connection with IWO's default under its Secured Credit Agreement, IWO commenced negotiations with the Steering Committee of Lenders regarding a restructuring of IWO's obligations under the Secured Credit Agreement and IWO's other indebtedness.  Facing the prospect of a default on its July 15, 2004 interest payment on the Senior Notes, IWO also initiated discussions with the Senior Noteholder Committee regarding the terms of a restructuring.  To aid IWO in its restructuring efforts, IWO retained James J. Loughlin, Jr. as IWO's Chief Restructuring Officer in March 2004 to facilitate and finalize IWO's negotiations with its creditors and Sprint PCS.

       In June 2004, IWO entered into the Forbearance Agreement with certain members of the Senior Noteholder Committee.  In connection with the execution of the Forbearance Agreement, the Debtors received from the Senior Noteholder Committee's legal counsel a written proposal for the restructuring of IWO involving (i) the issuance by IWO of one or more series of new notes, the proceeds of which would be used to pay in full all outstanding principal and accrued interest under the Secured Credit Agreement, (ii) the conversion of the Senior Notes into 100% of the equity of Reorganized IWO Holdings, and (iii) the key terms of a proposed amendment to IWO's affiliation agreements with Sprint PCS, including resolution of IWO's disputes with Sprint PCS and its build-out requirements.  Such proposal became the framework for a comprehensive restructuring of

IWO's obligations, which has led to the Plan of Reorganization that is the subject of this Disclosure Statement.

In November 2004, after extensive negotiations with the Senior Noteholder Committee, the Steering Committee of Lenders and Sprint PCS, the Debtors reached agreement in principle with those groups to restructure and substantially reduce the Debtors' outstanding indebtedness.  The parties agreed that the relief accorded by chapter 11 will help maintain the confidence of the Debtors' creditors and enable the Debtors to take the necessary actions to protect and enhance their business and the value that will inure to creditors.  To this end, the Debtors, the Senior Noteholder Committee and the Steering Committee of Lenders have agreed that a "prepackaged" chapter 11 would be the best vehicle to implement the proposed restructuring, and thereafter negotiated the terms of the Plan of Reorganization.

In connection with the negotiation of the Plan of Reorganization, the Debtors entered into the Lock Up Agreement with members of the Senior Noteholder Committee.  Pursuant to the terms and conditions of the Lock Up Agreement, the holders of 68% of the Senior Notes have agreed to vote to accept the Plan of Reorganization subject to the terms thereof.

If sufficient votes are received in number and amount to enable a bankruptcy court to confirm the Plan of Reorganization, the Debtors intend to file voluntary petitions for reorganization and to seek, as promptly as practicable thereafter, confirmation of the Plan of Reorganization.

## C.    Modification to Sprint Agreements

A key component of the restructuring of IWO's debt obligations is the modification of its agreements with Sprint PCS, including the simplification and reduction of billing and pricing features, relief from certain burdensome and unfeasible build-out obligations, an increase in the reciprocal roaming rate and the settlement of outstanding monetary disputes.  In that regard, IWO and Sprint PCS have reached an agreement in principle (the "Sprint Settlement") that would settle all disputes between the parties as of October 31, 2004 and provide for a modification of their contractual relationship.  IWO and Sprint PCS have entered into a letter of intent that provides for the principal terms and conditions of the Sprint Settlement and the Sprint Amendments.  The Sprint Amendments will be effective on the Consummation Date with the economic terms applied retroactively to November 1, 2004.  The Sprint Settlement provides that IWO will assume the Sprint Agreements, as amended by the Sprint Amendments, in its Plan of Reorganization.  As of the date of this Disclosure Statement, the Sprint Amendments have not been executed.  It is a condition precedent to the consummation of the Plan of Reorganization that the Sprint Amendments be executed and delivered by the parties thereto.  See Section IV.I below, entitled "THE PLAN OF REORGANIZATION – Conditions Precedent to Consummation Date."

8

1.    <u>Sprint Amendments</u>

The Sprint Amendments will provide IWO with, among other things, a reduced fixed fee for back office and other services that IWO is required to purchase from Sprint PCS and an increased reciprocal roaming rate.  Had the Sprint Amendments been in effect as of January 1, 2003, IWO estimates that the Sprint Amendments collectively would have increased Adjusted Operating Income for the twelve months ended December 31, 2003 by approximately $1.5 million compared to IWO's historical results of operations.  See Section I.C above, entitled "DESCRIPTION OF THE BUSINESS – Selected Financial Information."  In addition, IWO believes that the Sprint Amendments will simplify the way it conducts business with Sprint PCS and provide greater clarity and predictability to revenues and expenses allowing IWO to continue to focus on sustaining the growth of IWO's business and improving profitability.

The Sprint Amendments will combine a number of the services that IWO is required to purchase from Sprint PCS into two groups, "cash cost per user" or "CCPU" services and "cost per gross addition" or "CPGA" services.  CCPU services include billing, customer care, operator services and similar back office services.  CPGA services include subscriber activation, credit verification and handset logistics.  Upon effectiveness of the Sprint Amendments, (i) the fee for CCPU services per subscriber per month will be $7.25 retroactive to November 1, 2004 through the end of 2004, $7.00 for 2005 and $6.75 for 2006, and (ii) retroactive to November 1, 2004, the fee for CPGA services per month will be an amount equal to the gross customer additions in IWO's service area multiplied by the lesser of (a) $23.00 or (b) the quotient of (1) the amount that Sprint PCS billed IWO from January 1, 2004 through September 30, 2004 for IWO's activation-related costs, divided by (2) the gross customer additions in IWO's service area on which the amount billed in clause (1) is based.  Beginning in January 2007, the fees for CCPU services and CPGA services will be adjusted based on a methodology set forth in the Sprint Amendments.

The Sprint Amendments will also establish a fixed reciprocal roaming rate, which rate will be retroactive to November 1, 2004 and continue through December 31, 2006, of $0.058 per minute for voice and 2G data minutes, and $0.0020 per kilobyte for 3G data, in each case, for all subscribers of Sprint PCS service that travel into and out of the IWO coverage areas as of the date of the Sprint Amendments. These new fixed reciprocal rates are higher than the rates Sprint PCS has established for 2004 for its PCS affiliates that have not amended their affiliate agreements with Sprint PCS. Beginning in January 2007, the Sprint PCS reciprocal roaming rate for voice and 2G and 3G data will change to rates equal to 90% of Sprint's effective retail yields for voice and data, respectively.

The Sprint Amendments will also modify IWO's network build-out requirements for certain locations in Vermont, New Hampshire and New York that were determined to be uneconomical to deploy.  This modification reduces the number of additional cell sites that IWO is required to deploy from 174 to approximately 103 and lowers IWO's projected capital expenditures to build-out and service these areas by approximately $19 million.

9

The Sprint Amendments, subject to certain exceptions and minimum pricing, require IWO to participate in certain new resale programs; however, the Sprint Amendments will provide IWO with protective rights to decline to implement certain future program requirement changes that Sprint PCS proposes that would adversely affect IWO's business. The Sprint Amendments will also grant IWO, through December 2006, the right to amend IWO's affiliation agreements with Sprint PCS to obtain the most favorable terms provided under affiliation agreements with any other Sprint PCS affiliate of similar size so long as IWO agrees to accept all of the terms and conditions set forth in any such other agreement. IWO will also have a right of first refusal to build out new coverage within IWO's territory. If IWO does not exercise this right, then Sprint PCS may build-out the new coverage, or may allow a third party to do so.

      2.      Resolution of Disputed Charges

In addition to providing for the Sprint Amendments, the Sprint Settlement provides for the resolution of all previously disputed charges between IWO and Sprint PCS. Under the Sprint Settlement, IWO has agreed to pay Sprint PCS $6 million relating to the resolution of approximately $16 million of such charges with Sprint PCS to resolve all disputes through October 31, 2004. The Sprint Settlement further provides for mutual releases between the parties thereto.

The Debtors believe the Sprint Settlement is in the best interest of the Debtors, their estates, creditors and other parties in interest. Settlement of the disputed charges, together with the Sprint Amendments, allows the Debtors to avoid protracted and expensive litigation, the outcome of which is uncertain. Additionally, the Sprint Settlement and the Sprint Amendments allow the Debtors to continue their working relationship with Sprint PCS, which is essential to the Debtors' ongoing business operations and reorganization.

For a description of IWO's affiliation agreements with Sprint PCS, see Section I.B hereof, entitled "DESCRIPTION OF THE BUSINESS" – The Debtors' Relationship with Sprint PCS."

**D.     Possible Conversion of Independent Wireless One Corporation into a Limited Liability Company**

In connection with the implementation of the Plan of Reorganization, the Debtors may, in their discretion, convert IWO Corp. from a corporation to a limited liability company. Should the Debtors choose to effectuate any such conversion, the Debtors intend to do so in a manner that would not have material adverse tax consequences to the Debtors.

10

E.    **New Notes Offering**

**NEITHER THE FOLLOWING INFORMATION NOR ANY OTHER INFORMATION IN THIS DOCUMENT REGARDING THE NEW NOTES OFFERING CONSTITUTES AN OFFER TO BUY OR A SOLICITATION OF AN OFFER TO SELL THE NEW NOTES OR ANY OTHER SECURITIES IN CONNECTION THEREWITH.  THE NEW NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED OR SOLD IN THE UNITED STATES, ABSENT REGISTRATION OR AN APPLICABLE EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.**

In connection with the Reorganization, IWO Escrow Company, a newly formed Delaware corporation, will be offering $150 million in aggregate principal amount of Senior Secured Floating Rate Notes due in seven years (the "Senior Secured Notes") and $75 million in aggregate proceeds of Senior Discount Notes due in ten years (the "Senior Discount Notes").  The Senior Secured Notes and the Senior Discount Notes are referred to, collectively, as the "New Notes", and the offering of the New Notes is referred to as the "New Notes Offering."  The proceeds of the New Notes Offering will be used to repay all outstanding principal and accrued interest under the Secured Credit Agreement.

IWO Escrow Company is a special purpose vehicle that is not owned by IWO Holdings and will not be part of the bankruptcy estate of IWO Holdings.  In connection with the consummation of the Plan of Reorganization, IWO Escrow Company will be merged with and into IWO Holdings, and each series of New Notes will become the obligation of IWO Holdings and will be guaranteed by each of the subsidiaries of IWO Holdings.  If such merger has not been consummated or if IWO Escrow Company elects a special mandatory redemption by a certain date, IWO Escrow Company will redeem all of the Senior Secured Notes at a price equal to 100% of the aggregate principal amount of the notes, plus accrued interest up to, but not including, such date, and IWO Escrow Company will redeem all of the Senior Discount Notes at a price equal to 100% of the accreted value to, but not including, such date.  Prior to the Petition Date, IWO will pay approximately $6 to $8 million to IWO Escrow Company to fund such interest and increase in accreted value payments.

IWO Holdings will pay cash interest on the Senior Secured Notes quarterly in arrears.  Prior to the fifth year after their issuance, interest will accrue on the Senior Discount Notes in the form of an increase in the accreted value of the Senior Discount Notes.  Thereafter, cash interest on the Senior Discount Notes will accrue and be payable semiannually in arrears. The Senior Secured Notes will be the senior secured obligations of IWO Holdings and will be secured by a first priority lien on all of IWO Holdings' and its subsidiaries' tangible and intangible assets (subject to certain exceptions) and 100% of the capital stock of IWO Holdings' domestic subsidiaries.  The Senior Discount Notes will be the senior unsecured obligations of IWO Holdings and will rank equally with all of IWO Holdings' and its subsidiaries' unsubordinated indebtedness.  Each series of New

11

Notes will be guaranteed by each of IWO Holdings' subsidiaries. The indentures governing the New Notes will permit IWO Holdings to incur up to $30 million of additional indebtedness in the form of a secured credit facility, which may also be secured at the same priority level by the same assets securing the Senior Secured Notes.

Certain terms and conditions of the New Notes, including the interest rates thereon, have not yet been determined and the principal amount of the New Notes may be increased. In connection with the New Notes Offering, AIG Global Investment Corp. ("AIG"), Ares Leveraged Investment Fund II, L.P. ("Ares") and Eaton Vance Management ("Eaton Vance") or affiliates thereof or accounts managed thereby, each a holder of Senior Notes, have agreed to purchase, under certain circumstances if such Senior Discount Notes cannot be otherwise sold in the New Notes Offering, up to $60 million of Senior Discount Notes, subject to certain terms and conditions. Pursuant to such agreement, AIG, Ares and Eaton Vance will receive an aggregate fee of $1.2 million on the Consummation Date whether or not they purchase any of the Senior Discount Notes. If the Senior Discount Notes purchased by AIG, Ares and Eaton Vance pursuant to such commitment exceed a certain dollar amount, all of the Senior Discount Notes will be issued with penny warrants to acquire up to 15% of the equity of Reorganized IWO Holdings (on a fully diluted basis). If all such warrants are issued, the New Common Stock received by holders of Senior Note Claims under the Plan of Reorganization would represent approximately 85% of the outstanding New Common Stock, subject to dilution by any equity that may be issued pursuant to the Management Incentive Plan. Determination of the final terms and conditions of the New Notes, including the issuance of any equity in connection with the New Notes Offering, will be made prior to the closing of the New Notes Offering.

Additional information regarding the New Notes, as well as additional risk factors concerning IWO, will be included in the offering memorandum prepared in connection with the New Notes Offering (the "Offering Memorandum"), a copy of which will be filed with the Bankruptcy Court and annexed as an exhibit to the Plan of Reorganization Supplement. The risk factors section of the Offering Memorandum is attached as Exhibit 5 to this Disclosure Statement.

**IT IS A CONDITION PRECEDENT TO THE CONSUMMATION OF THE PLAN OF REORGANIZATION THAT THE NEW NOTES OFFERING BE CONSUMMATED. SEE SECTION IV.I. BELOW, ENTITLED "THE PLAN OF REORGANIZATION -- CONDITIONS PRECEDENT TO CONSUMMATION DATE."**

<u>Summary of Terms of New Notes</u>

The summary below describes the anticipated principal terms of the Senior Secured Notes and the Senior Discount Notes.  It does not purport to be a complete description of the terms and conditions of the New Notes, certain terms and conditions of which have not yet been determined.

Issuer ................................... IWO Escrow Company, which is to be merged with and into IWO Holdings upon consummation of the Plan of Reorganization.

Securities ............................. $150 million in aggregate principal amount of Senior Secured Notes and $75 million in aggregate proceeds of Senior Discount Notes, with an aggregate principal amount at maturity of Senior Discount Notes to be determined.

Maturity ............................... The Senior Secured Notes are expected to have a seven-year term and the Senior Discount Notes are expected to have a ten-year term.

Interest ................................. The Senior Secured Notes will accrue interest at a floating rate of interest based on LIBOR plus a spread and will be payable quarterly in arrears.  No scheduled principal payments are required prior to maturity.

The Senior Discount Notes will be issued at a substantial discount from their principal amount at maturity.  Prior to the fifth anniversary of their issuance (the "Cash Interest Date"), interest will accrue on the Senior Discount Notes in the form of an increase in the accreted value of the Senior Discount Notes.  Thereafter, cash interest on the Senior Discount Notes will accrue and be payable semiannually in arrears at a fixed rate of interest per year to be determined. The accreted value of each Senior Discount Note will increase from the date of issuance until the Cash Interest Date at the determined annual interest rate, compounded semiannually, reflecting the accrual of non-cash interest, such that the accreted value of the Senior Discount Notes will equal the principal amount at maturity on the Cash Interest Date.

Guarantees ............................ After the merger of IWO Escrow Company with and into IWO Holdings, the Senior Secured Notes will be guaranteed on a senior secured basis, and the Senior Discount Notes will be guaranteed on a senior unsecured basis, by all of IWO Holdings' existing and future restricted subsidiaries.

13

Ranking ............................... Upon consummation of the Plan of Reorganization, the Senior Secured Notes will be secured obligations of IWO Holdings, Inc., secured by a first priority lien on all of IWO Holdings' and its subsidiaries' assets (subject to certain exceptions), and by a pledge of the capital stock of the subsidiaries of IWO Holdings.   The indentures governing the notes are expected to permit IWO Holdings to incur up to $30 million of additional indebtedness in the form of a secured credit facility, which may also be secured at the same priority level by the same assets securing the Senior Secured Notes.

Upon consummation of the Plan of Reorganization, the Senior Discount Notes will be the unsecured obligations of IWO Holdings.  Accordingly, the senior discount notes will rank:

- equally in right of payment with all of IWO Holdings' unsubordinated indebtedness;

- senior in right of payment to all of IWO Holdings' future subordinated indebtedness; and

- effectively junior to all of IWO Holdings' existing and future secured indebtedness (including the Senior Secured Notes) to the extent of the value of the assets securing such indebtedness.

Upon consummation of the Reorganization, IWO Holdings' secured indebtedness is expected to consist entirely of the New Notes.

Optional Redemption ........... IWO may redeem the New Notes, in whole or in part, at any time on or after the second anniversary of their issuance in the case of the Senior Secured Notes or the fifth anniversary of their issuance in the case of the Senior Discount Notes, at redemption prices to be determined, plus accrued and unpaid interest.

In addition, on or before the third anniversary of their issuance, IWO may redeem up to 35% of the aggregate principal amount at maturity of each series of New Notes with the net cash proceeds from certain equity offerings at specified redemption prices.  IWO may only make such redemptions if at least 65% of the aggregate principal amount at maturity of such series of New Notes initially

14

issued under the indenture remains outstanding immediately after the occurrence of such redemption.

Change of Control ...............  Upon the occurrence of a change in control, IWO must offer to repurchase the New Notes, in the case of the Senior Secured Notes, at 101% of their principal value, plus accrued and unpaid interest, if any, to the date of repurchase and, in the case of the Senior Discount Notes, at 101% of their accreted value, to the date of purchase.

Certain Covenants ...............  The indentures governing the New Notes will limit IWO's ability and the ability of IWO's restricted subsidiaries, among other things, to:

- borrow money;

- pay dividends on or redeem or repurchase stock;

- make certain types of investments and other restricted payments;

- create liens;

- sell certain assets or merge with or into other companies;

- enter into certain transactions with affiliates;

- sell stock in IWO Holdings' restricted subsidiaries; and

- restrict dividends or other payments from IWO Holdings' subsidiaries.

These covenants contain important exceptions, limitations and qualifications.

Use of Proceeds ...................  The net proceeds from the New Notes Offering, together with existing IWO cash on hand, will be used to repay, in full, the borrowings under the Secured Credit Agreement, pay all or a portion of the fees and expenses of the Plan of Reorganization and provide cash liquidity for future operations requirements and general corporate purposes.

Registration Rights
Agreement;
Liquidated Damages ............  IWO has agreed to use its reasonable best efforts to conduct a registered exchange offer for the New Notes or cause to become effective a shelf registration statement providing for

15

resales of the notes.  If IWO fails to satisfy these obligations on a timely basis, IWO has agreed to pay liquidated damages to holders of the notes under certain circumstances.

Transfer Restrictions............    The New Notes will not be registered under the Securities Act and are not freely transferable.  The issuer does not intend to list the New Notes on any securities exchange.

### III.

### ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE

**A.      Chapter 11 Financing**

IWO anticipates financing its case under chapter 11 of the Bankruptcy Code by obtaining an order of the Bankruptcy Court authorizing it to, among other things, use the Lenders' cash collateral.  IWO further anticipates that, in connection with such use, it will be required to provide the Lenders with "adequate protection" of their interest in the cash collateral in the form of, among other things, replacement liens, priority for a portion of their claims, payments equal to the amount of accruing interest on the Lenders' claims, and reimbursement of the reasonable fees and expenses of the Agent's advisors.

**B.      Operational Issues After the Petition Date**

The Debtors intend to obtain certain orders from the Bankruptcy Court designed to minimize disruptions of business operations and to facilitate their reorganization.  These include, but are not limited to, the following:

Trade Vendor Matters.  The Debtors consider good relations with their trade and other business vendors to be essential to the continued operation of their business during the pendency of the Reorganization Cases.  Accordingly, and in light of the anticipated recovery to General Unsecured Creditors of 100%, the Debtors intend to request an order of the Bankruptcy Court authorizing payments to vendors as they become due in the ordinary course of business, including any amounts that may relate to claims arising prior to the Petition Date, as long as the vendors who receive such payments continue to provide the Debtors with customary shipments and credit terms.

Employee Matters.  On the Petition Date, the Debtors intend to seek an order of the Bankruptcy Court authorizing the Debtors to pay wages, salaries, reimbursable employee expenses and accrued and unpaid employee benefits incurred prior to the Petition Date.

Operation of Business.  The Debtors will also seek various other orders in order to allow a smooth transition through the chapter 11 process.  These include, but are not limited to, orders permitting the Debtors to continue their customer programs, to pay certain insurance obligations, including workers' compensation insurance, and to maintain their cash management system.

C.      **Confirmation Hearing**

The Debtors anticipate that as soon as practicable after commencing the Reorganization Cases, they will seek an order of the Bankruptcy Court scheduling a hearing to approve this Disclosure Statement and to consider confirmation of the Plan of Reorganization (together, the "Confirmation Hearing").  The Debtors anticipate that notice of the Confirmation Hearing will be published in The Wall Street Journal (National Edition) and will be mailed to all known holders of Claims and Equity Interests at least 25 days before the date by which objections to the Disclosure Statement or confirmation, as the case may be, must be filed with the Bankruptcy Court.  See Section VIII.A. below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION – Confirmation Hearing."

IV.

**THE PLAN OF REORGANIZATION**

A.      **Introduction**

The Plan of Reorganization provides for a major restructuring of the Debtors' financial obligations (such restructuring is referred to as the "Reorganization"). In essence, the Plan of Reorganization provides for the substantive consolidation of the Debtors for Plan of Reorganization purposes only.  In particular, the Plan of Reorganization (i) provides that the Secured Credit Agreement Claims will be paid in full in Cash from the net Cash proceeds of the issuance of the New Notes; (ii) provides the holders of Senior Note Claims, in the aggregate, with 100% of the New Common Stock, subject to dilution by any equity of Reorganized IWO Holdings that may be issued in connection with the New Notes Offering or pursuant to the Management Incentive Plan; (iii) does not impair Allowed Priority Non-Tax Claims, Allowed Other Secured Claims and Allowed General Unsecured Claims; and (iv) cancels Old Common Stock Interests. The Reorganization will have the effect of reducing the current Cash obligations of the Debtors and permitting them to conduct their business operations in a substantially deleveraged position, thus affording them maximum potential to improve profitability. The New Common Stock is described in detail in subsection C below, entitled "Securities to be Issued Pursuant to the Plan of Reorganization."

As described in subsection IV.J.6 below, entitled "Effect of Confirmation – Limited Release," the Plan of Reorganization provides certain parties with releases of all claims and causes of action based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Consummation Date.

The result of the restructuring will be a significant reduction of debt.  The Debtors believe that the proposed restructuring will provide the Debtors with the necessary liquidity to fund their operations and essential capital expenditures and to compete more effectively.

17

The Debtors believe, and will demonstrate to the Bankruptcy Court, that creditors will receive at least as much, if not more, in value under the Plan of Reorganization than they would receive in a liquidation case under chapter 7 of the Bankruptcy Code.

The following is a non-technical discussion of the provisions of the Plan of Reorganization. The Plan of Reorganization is attached as Exhibit 1 to this Disclosure Statement. The terms of the Plan of Reorganization govern in the event there are any discrepancies in the following discussion.

## B.      Substantive Consolidation

The Plan of Reorganization is premised upon the substantive consolidation of the Debtors for Plan of Reorganization treatment and distribution purposes only.

The substantive consolidation treatment of claims proposed by the Debtors involves the pooling and merger of the Debtors' assets and liabilities and distributions to creditors based upon all pooled assets and liabilities as if the Debtors conducted business as a single economic entity.

The Debtors believe substantive consolidation is warranted in light of the degree to which the Debtors and their creditors depend upon the integration of the Debtors' collective operations and the criteria established by courts in ruling on the propriety of substantive consolidation in other cases. For example,

- The officers and directors of each of the subsidiaries of IWO Holdings simultaneously have been officers and/or directors of IWO Holdings and vice versa, and corporate policy for all of the Debtors has been established and implemented by IWO Holdings' officers and board of directors. Thus, the Debtors have operated under unified management, direction and control with the goal of a unified profitability of the enterprise and without regard to the profitability of any individual legal entity in the corporate family;

- The Debtors operate under a consolidated cash management system. Funds collected at store locations are deposited into bank accounts in the name of IWO Corp. Such funds are transferred at least weekly into the Debtors' main concentration/disbursement account, which is in the name of IWO Holdings (the "Concentration Account"). All other incoming funds are also deposited into the Concentration Account, and all funds required by the Debtors to cover disbursements and other operating expenses are paid with checks written from the Concentration Account. Even though the Concentration Account is in the name of IWO Holdings, the name "IWO Corp." appears on checks written from the account. Additionally, funds from the Concentration Account are transferred to and from a trust investment account in the name of IWO Corp. No intercompany balances are created on the

18

Debtors' books when funds are transferred between the accounts in the name of the different Debtors, and IWO treats all funds in the accounts as being assets of IWO Corp;

- IWO Corp. has been responsible for the payment of day-to-day operating expenses of the Debtors and the performance of numerous business, professional and financial services on their behalf; and

- The holders of Senior Note Claims and Secured Credit Agreement Claims, as well as the Debtors' other creditors, relied upon the consolidated credit of the Debtors.

As a result of the Debtors' integrated and interdependent operations, interdebtor guarantees, common officers and directors, common control and decision making, reliance on a consolidated cash management system and dissemination of only consolidated financial information to the general public, the Debtors believe that they have operated, and creditors have dealt with the Debtors, as a single, integrated economic unit. Further illustrative of creditors' reliance upon the consolidated credit and creditworthiness of the Debtors as a single economic unit is the fact that IWO Corp. is a guarantor of IWO Holdings' obligations under the Senior Notes and all of the Debtors' assets collateralize IWO Corp.'s obligations under the Secured Credit Agreement.

In view of the foregoing, the Debtors believe that creditors would not be prejudiced by the Debtors' substantive consolidation, which is consistent with creditors' having dealt with the Debtors as a single economic entity, and further believe that substantive consolidation will best utilize the Debtors' assets and potential of all of the Debtors to pay to the creditors of each entity the distributions provided under the Plan of Reorganization. Moreover, because the only holders of Claims that are impaired are the holders of Senior Note Claims, on which both IWO Holdings and IWO Corp. are liable, substantive consolidation is appropriate and warranted and will not affect any distributions.

The Debtors have been advised by the Agent, on behalf of the Lenders, that (a) the Agent and Lenders do not intend to oppose the Plan of Reorganization's treatment of the Debtors on a substantively consolidated basis in view of the fact that the Plan of Reorganization provides for the payment in full of the Allowed Secured Credit Agreement Claims, (b) such non-opposition should not be construed as endorsement of, or acquiescence in, the Debtors' position with respect to substantive consolidation as set forth in this Disclosure Statement, and (c) the Agent and the Lenders reserve all of their rights to oppose substantive consolidation of the Debtors under any and all other circumstances.

## C.    Classification and Treatment of Claims and Equity Interests Under the Plan of Reorganization

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan of Reorganization and the descriptions below. In general,

an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court or other court of appropriate jurisdiction determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between the Debtors and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the Debtors' equity in the property, claims for services that exceed their reasonable value, lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.

Because the Debtors are providing notice of the Petition Date and the Confirmation Hearing to all holders of Claims and Equity Interests, and because holders of Secured Credit Agreement Claims, General Unsecured Claims, Other Secured Claims and Non-Tax Priority Claims are not impaired, the Debtors do not intend to set a bar date by which holders of Claims and Equity Interests must file proofs of claim and proofs of equity interest.  The Debtors anticipate that the filing of the chapter 11 petitions will have little or no impact on the business relationship with such creditors of the Debtors.  In addition, the Plan of Reorganization contemplates that holders of Equity Interests shall receive no distribution on account of such interests and that such interests shall be extinguished.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature.  Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature.  Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.  Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan).  If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case filed under chapter 7 of the Bankruptcy Code.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in Cash, with postpetition interest to the extent

appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization.  For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan of reorganization on account of their claims or equity interests.  Under this provision of the Bankruptcy Code, the holders of equity interests in Class 6 (Old Common Stock Interests) are deemed to reject the Plan of Reorganization because they receive no distribution under the Plan of Reorganization as such plan discharges the Debtor from obligations to holders of Old Common Stock Interests and cancels the Old Common Stock Interests.  Because Class 6 (Old Common Stock Interests) is deemed to reject the Plan of Reorganization, the Debtors are required to demonstrate that the Plan of Reorganization satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Class.  Among these are the requirements that the plan be "fair and equitable" and not "discriminate unfairly" against the holders of equity interests in such Class.  For a more detailed description of the requirements for confirmation, see Section VIII.B below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION – Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan of Reorganization divides the allowed claims against, and allowed equity interests in, the Debtors into the following classes:

| Classification | Description | Treatment |
|---|---|---|
| Unclassified | Administrative Expenses | Unimpaired |
| Unclassified | Priority Tax Claims | Unimpaired |
| Class 1 | Priority Non-Tax Claims | Unimpaired |
| Class 2 | Secured Credit Agreement Claims | Unimpaired |
| Class 3 | Other Secured Claims | Unimpaired |
| Class 4 | Senior Note Claims | Impaired |
| Class 5 | General Unsecured Claims | Unimpaired |
| Class 6 | Old Common Stock Interests | Impaired |

21

**Administrative Expenses**

Administrative expenses are the actual and necessary costs and expenses of the Debtors' chapter 11 cases that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code. Those expenses will include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Reorganization Cases and tax obligations incurred after the Petition Date. Other Administrative Expense Claims include the actual, reasonable and necessary professional fees and expenses of the Debtors' advisors, which fees and expenses are incurred during the pendency of the Reorganization Cases.

Allowed Administrative Expense Claims representing liabilities incurred by the Debtors in the ordinary course of business, consistent with past practice, or liabilities arising under loans or advances to the Debtors after the Petition Date, whether or not incurred in the ordinary course of business, will be paid by the Debtors in accordance with the terms and conditions of the particular transaction and any related agreements and instruments. All other Allowed Administrative Expense Claims will be paid, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Expense Claim, in full, in Cash, on the Consummation Date or as soon thereafter as is practicable, or on such other terms to which the Debtors and the holder of such Administrative Expense Claim agree.

All payments to professionals for compensation and reimbursement of expenses and all payments to reimburse expenses of members of any statutory committees will be made in accordance with the procedures established by the Bankruptcy Court and Bankruptcy Rules relating to the payment of interim and final compensation and expenses.

In addition to the foregoing, section 503(b) of the Bankruptcy Code provides for payment of compensation to creditors, indenture trustees and other Persons making a "substantial contribution" to a chapter 11 case, and to attorneys for, and other professional advisors to, such Persons. Requests for such compensation must be approved by the Bankruptcy Court after notice and a hearing at which the Debtors and other parties in interest may participate and, if appropriate, object to such requests.

**Priority Tax Claims**

Priority Tax Claims essentially consist of unsecured claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes and employment and withholding taxes. These unsecured claims are given a statutory priority in right of payment. The Debtors do not intend to set a bar date, and therefore it is difficult to estimate the number and amount, if any, of Priority Tax Claims that will be filed with the Bankruptcy Court.

With respect to any Priority Tax Claims not paid pursuant to prior Bankruptcy Court order, on the Consummation Date, except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment of such Allowed Priority

22

Tax Claim, the Reorganized Debtors shall pay, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, to each holder of an Allowed Priority Tax Claim (i) Cash in an amount equal to such Allowed Priority Tax Claim or (ii) equal annual Cash payments commencing on the Consummation Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate equal to 5%, over a period through the sixth (6th) anniversary of the date of assessment of such Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Consummation Date shall be paid thereafter in the ordinary course of business.  The Debtors do not intend to set a bar date for Priority Tax Claims.

### Class 1 – Priority Non-Tax Claims
*(Unimpaired.  Presumed to accept the Plan of Reorganization and not entitled to vote.)*

Priority Non-Tax Claims include certain claims that are granted priority in payment under section 507(a) of the Bankruptcy Code, including certain wage, salary and other compensation obligations to employees of the Debtors.  The Debtors do not intend to set a bar date, and therefore it is difficult to estimate the number and amount, if any, of Priority Non-Tax Claims that will be filed with the Bankruptcy Court.  With respect to any Priority Non-Tax Claims not paid pursuant to prior Bankruptcy Court order, on the Consummation Date, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment of such Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim shall be unimpaired in accordance with section 1124 of the Bankruptcy Code.  All Allowed Priority Non-Tax Claims that are not due and payable on or before the Consummation Date shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

### Class 2 – Secured Credit Agreement Claims
*(Unimpaired.  Presumed to accept the Plan of Reorganization and not entitled to vote.)*

Class 2 consists of the Allowed Secured Credit Agreement Claims.  IWO estimates that, as of the Petition Date, the aggregate principal amount of Allowed Secured Credit Agreement Claims will be approximately $215.0 million, plus contingent claims in respect of the Letters of Credit in the aggregate amount of $1,611,100.  The Plan of Reorganization provides that each Secured Credit Agreement Claim constitutes an Allowed Secured Credit Agreement Claim.

On the Consummation Date, (i) each holder of an Allowed Secured Credit Agreement Claim shall receive payment in full, in Cash, of the outstanding principal amount of its claim, any accrued and unpaid interest thereon and any other amounts contractually owing to such holder under the Secured Credit Agreement, (ii) the Letters of Credit issued and outstanding immediately prior to the Consummation Date will be (x) cancelled and returned to the Agent, (y) covered fully by a backstop letter of credit, in form and substance acceptable to the Agent, issued by a bank acceptable to the Agent, or (z) if consented to by the Agent in its sole discretion, secured by cash collateral in the

amount of 105% of the aggregate available amount of such Letters of Credit, and (iii) the Agent, each holder of an Allowed Secured Credit Agreement Claim, and each advisor of the Agent shall be entitled to retain all prepetition payments made under the Secured Credit Agreement and all amounts paid to such persons as adequate protection, in each case free of setoff, deduction, avoidance or other impairment.

### Class 3 – Other Secured Claims
(*Unimpaired.  Presumed to accept the Plan of Reorganization and not entitled to vote*.)

Class 3 consists of Allowed Secured Claims, other than the Class 2 Secured Credit Agreement Claims.  With respect to any Other Secured Claims not paid pursuant to prior Bankruptcy Court order, on the Consummation Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Allowed Other Secured Claim shall be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such claim prior to its stated maturity from and after the occurrence of a default.  All Allowed Other Secured Claims that are not due and payable on or before the Consummation Date shall, at the Debtors' option, be paid (i) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claim, or (ii) by transfer of the property securing the Allowed Other Secured Claim to the holder of such Claim.

### Class 4 – Senior Note Claims
(*Impaired.  Entitled to vote*.)

Class 4 consists of the Allowed Claims of the holders of Senior Notes.  The Plan of Reorganization provides that each Senior Note Claim constitutes an Allowed Senior Note Claim.  On the Consummation Date, except to the extent that a holder of an Allowed Senior Note Claim agrees to less favorable treatment, each holder of an Allowed Senior Note Claim shall receive its Ratable Proportion of 100% of the New Common Stock, subject to dilution by any equity of Reorganized IWO Holdings that may be issued in connection with the New Notes Offering or pursuant to the Management Incentive Plan.

The Debtors estimate that the overall recovery for Class 4 will be approximately 47%[2] under the Plan of Reorganization.

---

[2] Estimated recovery is based upon an $85 million assumed equity reorganization value for the Debtors and Senior Note Claims comprised of $181.5 million of principal and accrued and unpaid interest as of December 31, 2004 and does not reflect any equity that may be issued in connection with the New Notes Offering  or pursuant to the Management Incentive Plan.

**Class 5 – General Unsecured Claims**
> (*Unimpaired. Deemed to accept the Plan of Reorganization and not entitled to vote.*)

Class 5 consists of unsecured non-priority claims, which generally include the claims of trade and other business creditors for goods and services provided to the Debtors prior to the Petition Date and other damage or general litigation claims. The Debtors do not intend to set a bar date, and therefore it is difficult to estimate the number and amount, if any, of General Unsecured Claims that may be filed with the Bankruptcy Court.

With respect to any Allowed General Unsecured Claims not paid pursuant to prior Bankruptcy Court order, on the Consummation Date, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim, each Allowed General Unsecured Claim shall be unimpaired in accordance with section 1124 of the Bankruptcy Code. All Allowed General Unsecured Claims that are not due and payable on or before the Consummation Date shall be paid thereafter in the ordinary course of business in accordance with the terms of any agreement that governs such General Unsecured Claim or in accordance with the course of practice between the Debtors and such holder with respect to such Claim. The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Consummation Date.

**Class 6 – Old Common Stock Interests**
> (*Deemed to reject the Plan of Reorganization. Not entitled to vote.*)

Class 6 consists of the Allowed Old Common Stock Interests. The Plan of Reorganization provides that for Plan of Reorganization purposes, each Old Common Stock Interest constitutes an Allowed Old Common Stock Interest. On the Consummation Date, the Allowed Old Common Stock Interests shall be cancelled and the holders of the Allowed Old Common Stock Interests will not be entitled to, and shall not receive or retain, any property or interest in property on account of such Allowed Old Common Stock Interests.

**D.     Securities to Be Issued Pursuant to the Plan of Reorganization**

1.     <u>New Common Stock</u>

Pursuant to the Plan of Reorganization, on the Consummation Date, five (5) million shares of common stock of Reorganized IWO Holdings (the "New Common Stock"), representing 100% of Reorganized IWO Holdings' issued and outstanding common stock, subject to dilution by any equity of Reorganized IWO Holdings that may be issued in connection with the New Notes Offering or pursuant to the Management Incentive Plan, will be distributed to the holders of Allowed Senior Note Claims.

The holders of the New Common Stock will be entitled to one vote per share on all matters voted on by stockholders, including elections of directors and, except

as otherwise required by law or provided in any resolution adopted by IWO Holdings' Board of Directors in connection with the creation of any series of preferred stock, the holders of such shares exclusively possess all voting power.  Subject to the preferential rights of any future series of preferred stock, the holders of the New Common Stock will be entitled to such dividends as may be declared from time to time by the Board of Directors of IWO Holdings from funds available therefor and, upon liquidation will be entitled to receive pro rata all assets of IWO Holdings available for distribution to such holders.  The New Common Stock will rank junior to any series of preferred stock that ranks senior to the New Common Stock with respect to dividends and distributions and rights upon liquidation, dissolution or winding up.

      2.    <u>Securities Law Matters</u>

      (a)    <u>The Solicitation</u>.  The solicitation is being made only to those creditors who are Accredited Investors as defined in Regulation D under the Securities Act.

      (b)    <u>Issuance and Resale of New Common Stock Under the Plan of Reorganization</u>.  Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor.  In reliance upon this exemption, New Common Stock generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of new securities issued under the Plan of Reorganization are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

      Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from Persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is a control Person of the issuer of the securities.

      Notwithstanding the foregoing, statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions.  Parties who believe they

may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

Additionally, the Plan of Reorganization provides that any Senior Noteholder receiving distributions of New Common Stock issued on the Consummation Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted, shall be entitled to become a party to the New Common Stock Registration Rights Agreement, which provides that Reorganized IWO Holdings will provide certain registration rights to such holders for the New Common Stock. The New Common Stock Registration Rights Agreement shall be as set forth in the Plan of Reorganization Supplement.

(c)     Listing. IWO Holdings' existing common stock is not, and upon the Consummation Date the New Common Stock will not be, publicly traded or listed on any nationally recognized market or exchange. Accordingly, no assurance can be given that a holder of New Common Stock will be able to sell such securities in the future or as to the price at which any sale may occur. However, upon the Consummation Date, in accordance with the terms of the New Notes, Reorganized IWO Holdings will remain an SEC reporting company.

(d)     Legends. Certificates evidencing shares of New Common Stock received by holders of at least 10% of the outstanding New Common Stock will bear a legend substantially in the form below:

> **THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS IWO RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED**.

**E.     Means of Implementation of the Plan of Reorganization**

1.     Substantive Consolidation

The Plan of Reorganization is premised upon the substantive consolidation of the Debtors for Plan of Reorganization purposes only. Accordingly, on the Consummation Date, all of the Debtors and their Estates shall, for Plan of Reorganization purposes only, be deemed merged and (i) all assets and liabilities of the Debtors shall be treated for Plan of Reorganization purposes only as though they were merged, (ii) all guarantees of any Debtor of the payment, performance, or collection of obligations of any

other Debtor shall be eliminated and canceled, (iii) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (iv) any Claim filed in the Reorganization Cases of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Consummation Date.  Such substantive consolidation shall not (other than for Plan of Reorganization voting, treatment and distribution purposes) affect (a) the legal and corporate structures of the Debtors, (b) any Intercompany Claims, or (c) the equity interests in the subsidiaries of IWO Holdings.

      2.        Corporate Action Regarding Issuance of New Common Stock

The Plan of Reorganization provides that the issuance of the New Common Stock by Reorganized IWO Holdings is authorized without the need for any further corporate action or without any further action by a holder of Claims or Equity Interests in IWO Holdings.  On the Consummation Date, 100% of the New Common Stock shall be issued to holders of the Allowed Senior Note Claims (or their designees), subject to dilution by any equity of Reorganized IWO Holdings that may be issued in connection with the New Notes Offering or pursuant to the Management Incentive Plan.

      3.        Sprint Amendments and Settlement

On the Consummation Date, IWO will pay to Sprint PCS the amounts provided for in the Sprint Settlement, in full satisfaction of all obligations due to Sprint PCS through October 31, 2004 and the Reorganized Debtors' relationship with Sprint PCS will be governed by the Sprint Agreements, as amended by the Sprint Amendments. Copies of the Sprint Amendments and the Sprint Settlement will be filed with the Bankruptcy Court as part of the Plan of Reorganization Supplement.  The entry of the Confirmation Order will constitute the approval by the Bankruptcy Court of the Sprint Settlement, including the Sprint Amendments, and will authorize the Debtors to enter into and to consummate the Sprint Settlement.

      4.        Cancellation of Existing Securities and Agreements

On the Consummation Date, the Secured Credit Agreement, the Indenture, the Old Common Stock Interests, or any other agreements or commitments, contractual or otherwise, obligating IWO Holdings to issue, transfer or sell Old Common Stock Interests or any other Equity Interests of IWO Holdings shall be cancelled.  The Indenture shall, however, continue in effect solely for the purpose of allowing the Indenture Trustee to make the distributions on account of Senior Note Claims under the Plan of Reorganization and allowing the Indenture Trustee to receive its fees and expenses in full and in cash on the Consummation Date.

5.      Possible Conversion of Independent Wireless One Corporation into a Limited Liability Company

In connection with the implementation of the Plan of Reorganization, the Debtors may, in their discretion, convert Independent Wireless One Corporation from a corporation to a limited liability company.

6.      Registration Rights

Any holder of Senior Notes receiving distributions of New Common Stock issued on the Consummation Date that is not entitled to an exemption from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, or whose resale of the New Common Stock is otherwise restricted, shall be entitled to become a party to the Registration Rights Agreement.  The New Common Stock Registration Rights Agreement shall be as set forth in the Plan of Reorganization Supplement.

7.      The New Notes Offering

On the Consummation Date, IWO Escrow Company, the issuer of the New Notes, will be merged with and into Reorganized IWO Holdings, and the New Notes will become the obligation of Reorganized IWO Holdings and will be guaranteed by each of the subsidiaries of Reorganized IWO Holdings.

8.      General Corporate Action

(a)      Restated Certificate of Incorporation and Restated Bylaws.  The Restated Certificate of Incorporation and Restated Bylaws shall be adopted effective as of the Consummation Date.  On or about the Consummation Date, Reorganized IWO Holdings shall adopt the Restated Certificate of Incorporation and file it with the Secretary of State of Delaware.  In addition, on or about the Consummation Date, the certificates of incorporation of the other Debtors will be amended and filed with the Secretary of State of Delaware.

(b)      Board of Directors of Reorganized IWO Holdings.  On the Consummation  Date, the operation of Reorganized IWO Holdings shall become the general responsibility of its Board of Directors, subject to, and in accordance with, its certificate of incorporation and bylaws.  The initial Board of Directors of Reorganized IWO Holdings shall consist of five (5) members, all of whom shall be selected by the Senior Noteholder Committee.  The initial members of the Board of Directors of Reorganized IWO Holdings shall be disclosed in the Plan of Reorganization Supplement or such other filing as may be made with the Bankruptcy Court prior to the Confirmation Date.  The Board of Directors of the other Debtors shall be as set forth in the Plan of Reorganization Supplement or such other filing as may be made with the Bankruptcy Court prior to the Confirmation Date.

(c)      Officers of Reorganized IWO.  The initial officers of the Reorganized Debtors, together with biographical information, shall be disclosed in a filing

to be made with the Bankruptcy Court prior to the Confirmation Date.  The selection of officers of the Reorganized Debtors after the Consummation Date shall be as provided in their respective restated certificates of incorporation and restated bylaws or other organizational documents of the Reorganized Debtors.  The biographical information of the current directors (Robert W. Piper, Thomas G. Henning and George J. Mack) and executive officers of IWO Holdings is set forth in IWO Holding's Form 10-K for the fiscal year ended December 31, 2003, a copy of which is attached as Exhibit 3 to this Disclosure Statement.  In addition, James J. Loughlin, Jr. has been IWO's Chief Restructuring Officer since March 2004.  Mr. Loughlin is a founding principal of Loughlin Meghji + Co., a financial advisory firm offering restructuring, distressed mergers and acquisitions and crisis management consulting services.

**F.     Provisions Governing Distributions**

      1.     <u>Date of Distributions</u>

      Unless otherwise provided in the Plan of Reorganization, any distributions and deliveries to be made therein will be made on the Consummation Date or as soon as practicable thereafter.  The payments and deliveries required to be made on account of Allowed Secured Credit Agreement Claims and Letters of Credit under Sections 4.2(b)(i) and 4.2(b)(ii) of the Plan of Reorganization shall be made on the Consummation Date.  In the event that any payment or act under the Plan of Reorganization is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

      2.     <u>Disbursing Agent</u>

      In general, a disbursing agent is an entity designated to administratively effect the distributions to be provided under a plan of reorganization.  The Debtors do not intend to set a bar date by which creditors and equity holders must file proofs of claim or proofs of equity interest.  In addition, the Debtors do not anticipate designating a special disbursing agent.  It is anticipated that all distributions under the Plan of Reorganization will be made by the Reorganized Debtors as Disbursing Agent, but the Debtors reserve the right to designate another entity as Disbursing Agent on the Consummation Date.  The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that a Disbursing Agent is ordered otherwise, all costs and expenses of procuring any such bond or surety will be borne by the Reorganized Debtors.

      3.     <u>Record Date for Distribution</u>

      At the close of business on the Distribution Record Date, the transfer ledgers or registers for the Senior Notes shall be closed, and there shall be no further changes in the record holders of the Senior Notes.  The Reorganized Debtors and the Disbursing Agent, if any, shall have no obligation to recognize any transfer of any Senior Notes occurring after the Distribution Record Date and shall be entitled instead to

recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers or registers for the Senior Notes as of the close of business on the Distribution Record Date.  The record date for distributions on Secured Credit Agreement Claims shall be the Distribution Record Date.

  4.  <u>Delivery of Distributions</u>

    Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth in the books and records of IWO or its agents, unless the applicable Reorganized Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or interest by such holder that contains an address for such holder different from the address reflected on such schedules for such holder.  All distributions on account of Allowed Secured Credit Agreement Claims required pursuant to Section 4.2(b)(i) of the Plan of Reorganization shall, however, be paid to the Agent for distribution to those persons who held Allowed Secured Credit Agreement Claims as of the Distribution Record Date.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent will use reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution will be made to such holder without interest; provided that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Consummation Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the claim of any other holder to such property or interest in property will be discharged and forever barred.

  5.  <u>Manner of Payment Under Plan of Reorganization</u>

    At the option of the Disbursing Agent, any Cash payment to be made under the Plan of Reorganization may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.  The distributions on account of Allowed Secured Credit Agreement Claims pursuant to Section 4.2(b)(i) of the Plan of Reorganization shall, however, be made by wire transfer to the Agent to an account specified by the Agent.  Additionally, the payments to Sprint PCS pursuant to the Sprint Settlement shall be made by wire transfer to Sprint PCS to an account specified by Sprint PCS.  All distributions of New Common Stock to the holders of Allowed Senior Note Claims under the Plan of Reorganization shall be made by Reorganized IWO Holdings on behalf of the Reorganized Debtors.

  6.  <u>Fractional Shares</u>

    No fractional shares of New Common Stock or Cash in lieu thereof will be distributed.  For purposes of distribution, fractional shares of New Common Stock of 1/2 or more shall be rounded up to the next whole number and of less than 1/2 shall be rounded down to the next whole number.

7.      Allocation of Plan of Reorganization Distributions Between Principal and Interest

Under the Plan of Reorganization, distributions in respect of Allowed Senior Note Claims shall be allocated first to the principal amount of such Allowed Senior Note Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Senior Note Claims, to any portion of such Allowed Senior Note Claims for accrued but unpaid interest.

8.      Distribution of New Common Stock

All distributions of New Common Stock or Cash under the Plan of Reorganization shall be made by or on behalf of the applicable Reorganized Debtor in accordance with the Plan of Reorganization.

9.      Setoffs and Recoupment

IWO may, but shall not be required to, set off against, or recoup from, any Claim and the payments to be made pursuant to the Plan of Reorganization in respect of such Claim (other than Secured Credit Agreement Claims), any claims of any nature whatsoever that IWO may have against the claimant, but neither the failure to do so nor the allowance of any claim under the Plan of Reorganization will constitute a waiver or release by IWO of any such claim it may have against such claimant.

10.     Distributions After Consummation Date

Distributions made after the Consummation Date to holders of Disputed Claims that are not Allowed Claims as of the Consummation Date but which later become Allowed Claims will be deemed to have been made on the Consummation Date.

11.     Rights and Powers of Disbursing Agent

(a)     Powers of the Disbursing Agent.  The Disbursing Agent will be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan of Reorganization, (ii) make all distributions contemplated by the Plan of Reorganization, (iii) employ professionals to represent it with respect to its responsibilities and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan of Reorganization, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan of Reorganization.

(b)     Expenses Incurred On or After the Consummation Date.  Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Consummation Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney fees and expenses) made by the Disbursing Agent will be paid in Cash by the Reorganized Debtors.

32

12.    Exculpation

The Debtors, the Reorganized Debtors, US Unwired, the Lenders, the Agent, the Steering Committee of Lenders, the Senior Noteholder Committee, the Indenture Trustee, Sprint PCS and the Disbursing Agent, and their respective successors, predecessors, control persons, members, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers, accountants and other professionals retained by such Persons) shall have no liability to any holder of a Claim or Equity Interest for any act or omission in connection with, or arising out of, the negotiation and pursuit of approval of the Disclosure Statement or the Plan of Reorganization or the solicitation of votes for, or confirmation of, the Plan of Reorganization, the funding of the Plan of Reorganization, the consummation of the Plan of Reorganization, or the administration of the Plan of Reorganization or the property to be distributed under the Plan of Reorganization, except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court and, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan of Reorganization.

13.    Exemption from Securities Law

The issuance of the New Common Stock pursuant to the Plan of Reorganization shall be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code.

**G.    Procedures for Treating Disputed Claims Under Plan of Reorganization**

1.    Disputed Claims/Process

The Debtors do not intend to set a bar date by which holders of Claims and Equity Interests must file proofs of claim and proofs of equity interest.  The Debtors contemplate that on and after the Consummation Date, except as otherwise provided in the Plan of Reorganization, all Claims will be paid in the ordinary course of business.  If the Debtors dispute any Claim, such dispute shall be resolved or adjudicated by an appropriate tribunal in a manner as if the Reorganization Cases had not been commenced and will survive the Consummation Date as if the Reorganization Cases had not been commenced. If, however, a holder of a Claim files a proof of claim with the Bankruptcy Court that is inconsistent with the Debtors' books and records, the Debtors may elect, at their sole option, to object under section 502 of the Bankruptcy Code to any proof of claim filed by or on behalf of a holder of a Claim.

2.    Objections to Claims

Except insofar as a Claim is Allowed under the Plan of Reorganization, the Reorganized Debtors shall be entitled to object to Claims.  Any objections to Claims shall be served and filed on or before the latest of (a) sixty (60) days after the Consummation Date, (b) forty-five (45) days after a Claim is filed with the Bankruptcy Court or (c) such date as may be fixed by the Bankruptcy Court.

33

3.      No Distributions Pending Allowance

If a holder of a Claim files a proof of Claim and the Debtors object to such Claim, no payment or distribution provided under the Plan of Reorganization will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

4.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan of Reorganization.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan of Reorganization as of the Consummation Date, without any interest to be paid on account of such Claim.

## H.      Provisions Governing Executory Contracts and Unexpired Leases

1.      Assumption of Sprint Agreements, as Amended

On the Consummation Date and pursuant to sections 365, 1123(b)(2) and (3) of the Bankruptcy Code, the Debtors shall assume the Sprint Agreements, as amended by the Sprint Amendments.

2.      Assumption of Management Agreement

On the Consummation Date and pursuant to sections 365, 1123(b)(2) and (3) of the Bankruptcy Code (i) the Debtors shall assume the Management Agreement; (ii) the Debtors shall pay to US Unwired all amounts due at that time under, and in accordance with the terms of, the Management Agreement, including, but not limited to, any unpaid Management Fee, the Restructuring Premium, the Early Termination Fee, and the Transaction Fee (all as defined in the Management Agreement), without regard to any provision that expressly or impliedly refers to the approval, belief, satisfaction or any other similar finding of the Chief Restructuring Officer of the Debtors, in full satisfaction of all obligations due US Unwired through the Consummation Date; (iii) the Management Agreement, unless previously terminated, shall be deemed terminated as of the Consummation Date pursuant to Section 5(b) of the Management Agreement and the release contained in Section 11.6 of the Plan of Reorganization shall apply to all claims or causes of action against US Unwired that exist as of that date; and (iv) the Transition Period (as defined in the Management Agreement), unless previously commenced, shall commence on the Consummation Date and any and all further amounts due under the Management Agreement in accordance with the Management Agreement after such termination shall be paid on time and without regard to any provision of the Management Agreement that expressly or impliedly refers to the approval, belief, satisfaction or any other similar finding of the Chief Restructuring Officer of the Debtors, provided that US Unwired is not otherwise in breach of its obligations under the Management Agreement.

34

3.      <u>Assumed Contracts and Leases</u>

The Plan of Reorganization provides that, except as otherwise provided therein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan of Reorganization, as of the Consummation Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, (iii) is the subject of a motion to reject filed on or before the Confirmation Date or (iv) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, filed as part of the Plan of Reorganization Supplement.  The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Consummation Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court.

4.      <u>Payments Related to Assumption of Contracts and Leases</u>

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

5.      <u>Rejected Contracts and Leases</u>

Except as otherwise provided in the Plan of Reorganization or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan of Reorganization, none of the executory contracts and unexpired leases to which the Debtors are a party shall be rejected hereunder.  The Debtors, however, reserve the right, at any time prior to the Confirmation Date, to seek to reject any executory contract or unexpired lease to which the Debtors are a party.

6.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtors and their counsel within 30 days after the date of entry of an order of the Bankruptcy Court approving such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates and their property.

7.      Compensation and Benefit Plans and Treatment of Retirement Plan

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed hereunder.  The Debtors' obligations under such plans and programs shall survive confirmation of the Plan of Reorganization, except for (i) executory contracts or Benefit Plans specifically rejected pursuant to the Plan of Reorganization (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

I.      **Conditions Precedent to Consummation Date**

1.      Conditions Precedent to Consummation Date of Plan of Reorganization

The occurrence of the Consummation Date of the Plan of Reorganization is subject to satisfaction of the following conditions precedent:

(a)     Confirmation Order.  The Clerk of the Bankruptcy Court shall have entered the Confirmation Order.  The Confirmation Order shall be in form and substance reasonably satisfactory to the Senior Noteholder Committee, the Agent and Sprint PCS.

(b)     Sprint Settlement and Sprint Amendments.  The Sprint Settlement and the Sprint Amendments, in form and substance reasonably satisfactory to the Senior Noteholder Committee, shall have been executed and delivered.

(c)     New Notes Offering.  All conditions precedent to the consummation of the New Notes Offering shall have been waived or satisfied in accordance with the terms thereof, and the New Notes Offering shall have closed.

(d)     Execution and Delivery of Other Documents.  All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan of Reorganization shall have been effected in form and substance reasonably acceptable to the Senior Noteholder Committee.

2.      Waiver of Conditions Precedent

Each of the conditions precedent in Section 10.1 of the Plan of Reorganization may be waived, in whole or in part, by the Debtors.  None of the conditions precedent in Section 10.1 of the Plan of Reorganization may be waived without the prior written consent of the Senior Noteholder Committee, and, in the case of the condition precedent in Section 10.1(a) of the Plan of Reorganization, the Agent and Sprint PCS, and in the case of the condition precedent in Section 10.1(b) of the Plan of Reorganization, Sprint PCS, which consent shall, in each case, not be unreasonably withheld.

## J.    Effect of Confirmation

1.      Vesting of Assets

On the Consummation Date, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and the estate of the Debtors, as Debtors, shall vest in the Reorganized Debtors.  From and after the Consummation Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of the Plan of Reorganization.

2.      Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Consummation Date, on and after the Confirmation Date, the provisions of the Plan of Reorganization will bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan of Reorganization and whether or not such holder has accepted the Plan of Reorganization.

3.      Discharge of the Debtors

Except to the extent otherwise provided in the Plan of Reorganization, the treatment of all Claims against, or Equity Interests in, the Debtors under the Plan of Reorganization shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Equity Interests in the Debtors of any nature whatsoever, known or unknown, including, without limitation, any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estate or properties or interests in property.  Except as otherwise provided in the Plan of Reorganization, upon the Consummation Date, all Claims against, and Equity Interests in, the Debtors will be satisfied, discharged and released in full exchange for the consideration provided under the Plan of Reorganization.  Except as otherwise provided in the Plan of Reorganization, all entities shall be precluded from asserting against the Debtors or the Reorganized Debtors or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Consummation Date.

4.    Term of Injunctions or Stays

(a)    Except as otherwise expressly provided in the Plan of Reorganization, all Persons or entities who have held, hold or may hold Claims or Equity Interests are permanently enjoined, from and after the Consummation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any of the Reorganized Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to any such Claim or Equity Interest, and (v) pursuing any claim released pursuant to Section 11.6 of the Plan of Reorganization.

(b)    Unless otherwise provided, all injunctions or stays arising under or entered during the Reorganization Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Consummation Date.

5.    Indemnification Obligations

Subject to the occurrence of the Consummation Date, the obligations of the Debtors as of the Petition Date to indemnify, defend, reimburse or limit the liability of directors or officers who were directors or officers of the Debtors, on or after the Petition Date, respectively, against any claims or causes of action as provided in the Debtors' certificates of incorporation, bylaws or applicable state law, shall survive confirmation of the Plan of Reorganization, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Petition Date.

6.    Limited Release

On the Consummation Date, the Debtors and the Reorganized Debtors will release the officers and directors of the Debtors holding office at any time within one year prior to the Petition Date, the Senior Noteholder Committee, the Indenture Trustee, the Steering Committee of Lenders, the Lenders, the Agent and US Unwired and each of their respective successors, predecessors, control persons, members, officers, directors, agents, employees, advisors (including any attorneys, financial advisors, investment bankers, accountants and other professionals retained by such Persons or entities), affiliates and representatives from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whenever arising or whenever existing (before or after the Consummation Date), in law, at equity, or otherwise (except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court), that the

38

Debtors would have been legally entitled to assert in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest or other Person or entity would have been able to assert on behalf of the Debtors, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence, related to the Debtors taking place on or before the Consummation Date.

On the Consummation Date, the Senior Noteholder Committee, the Indenture Trustee, the Steering Committee of Lenders, the Lenders, the Agent and US Unwired and each of their respective agents, employees, advisors (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons or entities), affiliates and representatives (the "Release Parties") shall be deemed to have released, remised, and forever discharged the Debtors and the Reorganized Debtors and their officers and directors holding office at any time within one year prior to the Petition Date and each of their respective successors, predecessors, control persons, members, officers, directors, agents, employees, advisors (including any attorneys, financial advisors, investment bankers, accountants and other professionals retained by such Persons or entities), affiliates and representatives from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whenever arising and whenever existing (before or after the Consummation Date), in law, at equity, or otherwise (except for willful misconduct or gross negligence as determined by a Final Order of the Bankruptcy Court), that the Release Parties would have been legally entitled to assert in their own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence, related to the Debtors, taking place on or before the Consummation Date.

Nothing herein or in the Plan of Reorganization shall be deemed to release any rights, claims or interests that any Person may be receiving or retaining pursuant to the Plan of Reorganization on or after the Consummation Date.

## K.     Waiver of Claims

1.     Avoidance Actions

Effective as of the Consummation Date, the Debtors shall be deemed to have waived the right to prosecute, and to have settled and released for fair value, any avoidance or recovery actions under sections 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code that belong to the Debtors and/or which the Debtors could have prosecuted as debtors or debtors in possession.

## L.     Retention of Jurisdiction

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Case and the Plan of Reorganization pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan of Reorganization;

(d)    To hear and determine any timely objections to administrative expense claims or to proofs of claim and equity interests, including, without limitation, any objections to the classification of any Claim or Equity Interest, and to allow or disallow any Disputed Claim or Disputed Equity Interest, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    To issue such orders in aid of execution of the Plan of Reorganization, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    To consider any amendments to or modifications of the Plan of Reorganization, or to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)    To hear and determine all applications of retained professionals under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan of Reorganization, the Confirmation Order, any transactions or payments contemplated by the Plan of Reorganization or any agreement, instrument or other document governing or relating to any of the foregoing;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(k)    To hear any other matter not inconsistent with the Bankruptcy Code;

(l)    To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Section 11.3 of the Plan of Reorganization;

(m)    To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan of Reorganization; and

40

(n)      To enter a final decree closing the Reorganization Cases.

**M.    Miscellaneous Provisions**

1.      Payment of Statutory Fees

All fees payable under section 1930, chapter 123, title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on the Consummation Date.

2.      Administrative Expenses Incurred After the Confirmation Date

Subject to the terms and conditions of any interim or Final Order of the Bankruptcy Court authorizing the use of cash collateral, administrative expenses incurred by the Debtors or the Reorganized Debtors after the Confirmation Date, including (without limitation) Claims for professionals' fees and expenses, shall not be subject to application and may be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business and without further Bankruptcy Court approval.  The Debtors shall pay the costs and expenses incurred by the Agent (including, without limitation, the reasonable fees and expenses of counsel and other advisors to the Agent) in connection with consummation of the Plan of Reorganization.

3.      Intercompany Claims

Notwithstanding anything to the contrary herein or in the Plan of Reorganization, any debts held by a Debtor against another Debtor will be adjusted and discharged to the extent determined appropriate by the Debtors, taking into account the economic condition of the applicable Reorganized Debtor.

4.      Amendment

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan of Reorganization may be proposed in writing by the Debtors at any time prior to or after the Confirmation Date, but prior to the Consummation Date and in all cases subject to the approval of the Senior Noteholder Committee, the Agent and Sprint PCS, which approval shall not be unreasonably withheld. Holders of Claims that have accepted the Plan of Reorganization shall be deemed to have accepted the Plan of Reorganization, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.  Any holders of Claims, however, who were deemed to accept the Plan of Reorganization because such Claims were unimpaired shall continue to be deemed to accept the Plan of Reorganization only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

5.      Section 1125(e) of the Bankruptcy Code

As of the Confirmation Date, IWO shall be deemed to have solicited acceptances of the Plan of Reorganization in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  IWO, US Unwired, and, to the extent they participated in the offer and issuance of securities under the Plan of Reorganization, IWO Escrow Company, the Lenders, the Steering Committee of Lenders, the Agent, the holders of Senior Note Claims, the Senior Noteholder Committee and Sprint PCS (and each of their respective successors, predecessors, control persons, members, affiliates, agents, directors, officers, employees, investment bankers, financial advisors, accountants, attorneys and other professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities under the Plan of Reorganization.  Accordingly, such entities and individuals shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan of Reorganization or the offer and issuance of the securities under the Plan of Reorganization.

6.      Compliance with Tax Requirements

In connection with the Plan of Reorganization and all instruments issued in connection therewith and distributed thereunder, any party issuing any instruments or making any distribution under the Plan of Reorganization, including any party described in Section 7.2 of the Plan of Reorganization, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan of Reorganization shall be subject to any withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan of Reorganization shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instruments or making any distribution under the Plan of Reorganization has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or distributing party for payment of any such tax obligations.

7.      Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan of Reorganization, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan of Reorganization, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan of Reorganization shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.  All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Petition Date through and including the Consummation Date, including, without

limitation, the transfers effectuated under the Plan of Reorganization, the sale by the Debtors of owned property pursuant to section 363(b) of the Bankruptcy Code, and the assumption, assignment and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan of Reorganization and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

8.      Expedited Tax Determination

        The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Consummation Date.

9.      Severability of Plan of Reorganization Provisions

        In the event that, prior to the Confirmation Date, any term or provision of the Plan of Reorganization is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan of Reorganization shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan of Reorganization, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

10.     Governing Law

        Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit to the Plan of Reorganization or Plan of Reorganization Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such Exhibit), the rights, duties and obligations arising under the Plan of Reorganization shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws.

11.     No Admissions

        If the Consummation Date does not occur, the Plan of Reorganization shall be null and void in all respects, and nothing contained in the Plan of Reorganization shall (a) constitute a waiver or release of any claims by or against, or any interests in, any

43

Debtor, (b) prejudice in any manner the rights of any Debtor or any other party in interest, or (c) constitute an admission of any sort by any Debtor or other party in interest.

## V.

## PROJECTIONS AND VALUATION ANALYSIS

A.     **Consolidated Condensed Projected Financial Statements**

1.     <u>Responsibility for and Purpose of the Projections</u>

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan of Reorganization, and for purposes of determining whether the Plan of Reorganization satisfies this feasibility standard, management of IWO and IWO's professionals have analyzed the ability of IWO to meet its obligations under the Plan of Reorganization and retain sufficient liquidity and capital resources to conduct its business assuming the consummation of the Plan of Reorganization, including the New Notes Offering.

The projections contained herein (the "Projections") should be read in conjunction with Section VI below, entitled "CERTAIN FACTORS AFFECTING IWO", and with the risk factors set forth in the Offering Memorandum that are annexed hereto as Exhibit 5 and the assumptions, qualifications and footnotes to tables containing the Projections set forth herein, the historical consolidated financial information (including the notes and schedules thereto) and the other information set forth in IWO Holdings' Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and IWO Holdings' Quarterly Report on Form 10-Q for the period ended September 30, 2004 annexed hereto as Exhibits 3 and 4, respectively, the full texts of which are incorporated herein by reference, and the Selected Financial Data appearing in Item 6 of the Form 10-K.  The Projections were prepared in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  IWO'S INDEPENDENT ACCOUNTANTS HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.**

**IWO DOES NOT, AS A MATTER OF COURSE, PUBLISH ITS PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.  ACCORDINGLY, IWO DOES NOT INTEND,**

44

AND DISCLAIMS ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE CONSUMMATION DATE OR TO HOLDERS OF NEW COMMON STOCK OR ANY OTHER PARTY AFTER THE CONSUMMATION DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THESE PROJECTIONS HAVE BEEN PREPARED AND REVIEWED BY MANAGEMENT OF IWO.  UPON CONSUMMATION OF THE PLAN OF REORGANIZATION, US UNWIRED WILL NO LONGER MANAGE IWO PURSUANT TO THE MANAGEMENT AGREEMENT, AND THE MANAGEMENT CURRENTLY PROVIDED BY US UNWIRED WILL BE REPLACED BY NEW DIRECTORS AND A NEW MANAGEMENT TEAM.  THE NEW MANAGEMENT TEAM DOES NOT PRESENTLY WORK FOR IWO AND HAS HAD LIMITED RECENT INVOLVEMENT WITH IWO.  THERE CAN BE NO ASSURANCE THAT THE NEW MANAGEMENT TEAM OF IWO WILL IMPLEMENT THE BUSINESS PLAN UNDERLYING THESE PROJECTIONS OR ACHIEVE THE PROJECTED RESULTS.

THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT OF IWO, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND IWO'S CONTROL.  ACCORDINGLY, IWO CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE FOLLOWING ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.  THE REORGANIZED DEBTORS WILL BE REQUIRED TO ESTIMATE THEIR REORGANIZATION VALUE, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE CONSUMMATION DATE.  SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING ESTIMATES.  IN ALL EVENTS, THE REORGANIZATION VALUE, AS WELL

**AS THE DETERMINATION OF THE FAIR VALUE OF THE REORGANIZED DEBTORS' ASSETS AND THE DETERMINATION OF THEIR ACTUAL LIABILITIES, WILL BE MADE AS OF THE CONSUMMATION DATE. ALTHOUGH THE DEBTORS EXPECT TO UTILIZE A CONSISTENT METHODOLOGY, THE AMOUNTS OF ANY OR ALL OF THE FOREGOING ESTIMATES AS ASSUMED IN THE PROJECTIONS, AS COMPARED WITH THE ACTUAL AMOUNTS THEREOF AS OF THE CONSUMMATION DATE, MAY BE MATERIAL.**

    2.    <u>Summary of Significant Assumptions</u>

        The Projections are based on and assume the successful implementation of the business plan prepared by management of IWO and include assumptions with respect to the future performance of IWO, the performance of the industry, competition in the markets in which the Company operates, general business and economic conditions and other matters, many of which are beyond the control of management.  Therefore, while the Projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will vary from the projected results, and may vary substantially.  No representation can be or is being made with respect to the ability of IWO to achieve the projected results.  While management believes that the assumptions underlying the Projections are reasonable in light of current circumstances and in light of the information available, holders of claims and interests must make their own determinations as to the reasonableness of the assumptions and the reliability of the Projections in deciding whether to vote to accept the Plan of Reorganization.  There can be no assurance that the new management team of IWO will implement the business plan underlying these Projections or achieve the projected results.

        Additional information concerning the assumptions underlying the Projections is as follows:

        (a)    <u>Plan of Reorganization Terms and Consummation</u>.  The Projections assume a Consummation Date as of December 31, 2004, with allowed claims and equity interests treated in accordance with the treatment provided in the Plan of Reorganization with respect to such allowed claims and equity interests.  With respect to the projection of expenses to be incurred as a result of the Reorganization Case, if the Consummation Date does not occur by December 31, 2004, additional bankruptcy expenses will be incurred until such time as a plan of reorganization is confirmed.  These expenses could significantly impact IWO's results of operations and cash flows.

        (b)    <u>Assumptions Preceding the Consummation Date</u>.  The 2004 Income Statement projection includes nine months of actual results.  The business is projected to continue at its current level for the period from September 30, 2004 through the Consummation Date.

        (c)    <u>General Economic Conditions</u>.  The Projections were prepared assuming that economic conditions in the markets served by IWO do not differ markedly over the next three years from current economic conditions.

46

(d)     <u>Revenues</u>.  Revenue is generated by providing access to and usage of the IWO PCS network and through sales of merchandise.  Revenue consists primarily of subscriber revenue, roaming revenue and merchandise sales revenue.  Subscriber revenue is generated by providing voice and data transmission services to IWO's PCS subscribers.  Roaming revenue is generated by providing network services to other Sprint PCS and Sprint PCS affiliate subscribers while traveling in IWO's territory, as well as subscribers of other wireless carriers that contract with Sprint PCS for roaming or wholesale services in IWO's territory.  Merchandise sales revenue is generated primarily through sales of wireless handsets and accessories.  Over the projection period, revenues are projected to increase in the aggregate due to increasing levels of IWO subscribers as well as roaming and wholesale customers using IWO's network.

(e)     <u>Cost of Service</u>.  Cost of service consists primarily of network expenses, roaming expenses, expenses relating to administrative services provided by Sprint PCS and the Sprint PCS franchise fee.  Cost of service expenses as a percentage of revenues are expected to remain relatively stable during the projection period.

(f)     <u>Merchandise Cost of Sales</u>.  Merchandise cost of sales represent the cost of handsets that IWO offers to new subscribers.  The cost of handsets typically exceeds the revenues received from the sale of handsets to subscribers primarily because IWO subsidizes a portion of the price of handsets. Merchandise cost of sales as a percentage of revenues are expected to decline over the projection period due to declining handset prices.

(g)     <u>General and Administrative</u>.  General and administrative expenses consist primarily of management fees and customer service expenses.  Management fees in 2004 include fees paid to US Unwired for management services rendered to IWO under the Management Agreement.  After 2004, management fees represent costs associated with the new management of IWO.  General and administrative expenses as a percentage of revenues are expected to decrease over the projection period.

(h)     <u>Sales and Marketing</u>.  Sales and marketing expenses consist primarily of costs related to the acquisition of new subscribers and the retention of current subscribers.  These expenses include advertising, salary and benefits for the sales personnel, sales commissions, allocations for subsidies on handsets sold by Sprint PCS in IWO's territory and expenses associated with IWO's retail store locations.  Sales and marketing expenses as a percentage of revenues are projected to remain relatively stable during the projection period.

(i)     <u>Professional Fees</u>.  Represents professional fees incurred by IWO for accounting, legal, financial and consulting work.

(j)     <u>Interest Expense</u>.  The Projections for 2004 include a full year of interest expense under both the Secured Credit Agreement and the Senior Notes Indenture.  Following the Consummation Date, interest expense will reflect the interest expense associated with IWO's post-restructuring debt.

47

(k)     Income Taxes.  The Projections reflect the fact that the Debtors do not anticipate to incur income tax expense from 2004 to 2007 as a result of net pretax losses in those years.  Although the Projections reflect substantial net income for 2004, such income is principally due to fresh start accounting adjustments (which do not apply for federal income tax purposes) and gain on cancellation of debt (which is excluded from income for federal income tax purposes).

(l)     Capital Expenditures.  The projected capital expenditures consist primarily of (i) capital expenditures intended to increase the capacity of the network, (ii) expansion of the coverage of the network to new geographic areas, including capital expenditures required under the Sprint Amendments and (iii) costs associated with required upgrades to the network.

(m)     Fresh Start Accounting.  The American Institute of Certified Public Accountants has issued a Statement of Position on Financial Reporting by Entities in Reorganization Under the Bankruptcy Code ("SOP 90-7").  SOP 90-7 is intended to provide guidance for financial reporting by chapter 11 debtors during and following their chapter 11 cases.  The Projections, where applicable, have been prepared in accordance with the "fresh-start" reporting principles set forth in SOP 90-7, giving effect thereto as of and for the year ending December 31, 2004.

Under SOP 90-7, Reorganized IWO will be required to recognize as a long-term asset the excess of its total reorganization value over the fair value of its identifiable net assets as of the Consummation Date.  For purposes of the Projections, it has been assumed that the reorganization equity value of Reorganized IWO is equal to $85 million (see also Section V.B hereof).  Under SOP 90-7, the Debtors are required to allocate the total reorganization value to their assets and liabilities based upon their fair value at the date of emergence.  For purposes of these Projections, the Debtors have not determined the fair value of their assets and liabilities upon emergence, but have allocated the total reorganization value to identifiable assets and liabilities based on historical book value.  Upon emergence, the Debtors will allocate the total reorganization value to identifiable net assets, based on their fair value, and the difference will be reflected as reorganization value in excess of identifiable net assets.  These amounts may be significantly different from the amounts assumed and included in these Projections.

Under SOP 90-7, for the year ended December 31, 2004, the results of operations and cash flows for the period prior to emergence should be reflected as IWO prior to consummation of the Plan of Reorganization ("Predecessor IWO"), and the results of operations and cash flows for the period subsequent to emergence should be reflected as Reorganized IWO.  However, the Income Statement and Statement of Cash Flows have combined the results of operations and cash flows into one period for the Predecessor IWO and Reorganized IWO for the purposes of these Projections, which is not in accordance with generally accepted accounting principles.

(n)     Working Capital.  Components of working capital are projected on the basis of historic patterns applied to projected levels of operation.

48

(o)    <u>Total Debt</u>. The Projections reflect the issuance of (i) $150 million in aggregate principal amount of Senior Secured Notes and (ii) $75 million in aggregate proceeds of Senior Discount Notes.

3.    <u>Special Note Regarding Forward-Looking Statements</u>

Some matters discussed herein contain forward-looking statements that are subject to certain risks, uncertainties or assumptions and may be affected by certain other factors which may impact future results and financial condition.  In some cases, you can identify forward-looking statements by terminology such as "may," "should," "could," "expects," "plans," "projected," "anticipates," "believes," "estimates," "predicts," "potential," or "continues," or the negative of these terms or other comparable terminology.  In addition, except for historical facts, the "Projections and Valuation Analysis" provided in Section V herein, and the "Certain Factors Affecting IWO" provided in Section VI herein, should be considered forward-looking statements.  Should one or more of these risks, uncertainties or other factors materialize, or should underlying assumptions prove incorrect, actual results, performance or achievements of IWO may vary materially from any future results, performance or achievements expressed or implied by such forward-looking statements.

Forward-looking statements are based on beliefs and assumptions of the Debtors' management and on information currently available to such management.  Forward-looking statements speak only as of the date they are made, and the Debtors undertake no obligation to update publicly any of them in light of new information or future events.  Undue reliance should not be placed on such forward-looking statements, which are based on current expectations. Forward-looking statements are not guarantees of performance.  For additional information about the Debtors, their operating and financial condition, and relevant risk factors, reference is made to IWO Holdings' Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and IWO Holdings' Quarterly Report on Form 10-Q for the quarter ended September 30, 2004, as filed with the SEC and annexed as Exhibits 3 and 4 hereto, respectively.

4.    <u>Financial Projections</u>

Each of the following tables summarizes management's Projections for the four fiscal years ending December 31, 2004, 2005, 2006 and 2007.

The Projections include Projected Condensed Consolidated Statement of Operations, Projected Condensed Consolidated Balance Sheet, and Projected Condensed Consolidated Statement of Cash Flows.

**IWO Holdings, Inc. and Subsidiaries**
Projected Condensed Consolidated Statement of Operations
(in thousands)
(Unaudited)

|  | For the year ending December 31, | | | |
|  | **2004** | **2005** | **2006** | **2007** |
|---|---|---|---|---|
| Total revenue | $191,692 | $217,030 | $236,055 | $237,878 |
| Expense: | | | | |
|     Cost of service | 99,918 | 118,398 | 128,349 | 127,242 |
|     Merchandise cost of sales | 17,993 | 16,906 | 16,733 | 15,822 |
|     General and administrative | 9,630 | 8,635 | 9,240 | 9,387 |
|     Sales and marketing | 32,837 | 36,870 | 38,498 | 38,775 |
|     Depreciation and amortization | 35,147 | 49,675 | 53,274 | 57,134 |
|         Total operating expense | 195,525 | 230,484 | 246,094 | 248,361 |
| Operating income / (loss) | (3,833) | (13,454) | (10,039) | (10,483) |
| Reorganization items [1] | 258,402 | (6,365) | - | - |
| Interest expense, net [2] | (38,878) | (22,694) | (22,661) | (24,066) |
| Other [3] | (84) | - | - | - |
| Net income (loss) before income taxes | 215,607 | (42,513) | (32,700) | (34,549) |
|     Income taxes | - | - | - | - |
| Net income (loss) | $ 215,607 | $ (42,513) | $ (32,700) | $ (34,549) |

Notes:
(1) Includes professional fees and other expenses relating to the restructuring; gain from cancellation of
    indebtedness and accrued interest; write-down of debt issuance costs; fresh start accounting adjustments,
    and gain on dispute resolution with Sprint.
(2) Includes amortization of debt issuance costs.
(3) Includes loss on sale of assets.

**IWO Holdings, Inc. and Subsidiaries**
Projected Condensed Consolidated Balance Sheets
(in thousands)
(Unaudited)

| | For the year ending December 31, | | | |
| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| **Assets** | | | | |
| Current assets: | | | | |
| Cash & cash equivalents | $ 30,591 | $ 26,327 | $ 33,384 | $ 42,776 |
| Subscriber receivables, net | 10,934 | 12,047 | 12,580 | 13,437 |
| Other current assets | 8,908 | 9,029 | 7,911 | 7,806 |
| Total current assets | 50,434 | 47,403 | 53,876 | 64,019 |
| Property and equipment, net | 157,304 | 149,360 | 137,855 | 125,281 |
| Other assets, net [(1)] | 137,467 | 115,674 | 93,881 | 72,088 |
| Total assets | $345,205 | $312,437 | $285,611 | $261,388 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ 23,297 | $ 24,941 | $ 23,138 | $ 22,947 |
| Accrued interest | - | - | - | - |
| Accrued liabilities | 11,407 | 10,883 | 8,942 | 8,736 |
| Total current liabilities | 34,704 | 35,824 | 32,081 | 31,683 |
| Senior secured floating rate notes | 150,000 | 150,000 | 150,000 | 150,000 |
| Senior discount notes | 75,000 | 83,625 | 93,242 | 103,965 |
| Other liabilities | 501 | 501 | 501 | 501 |
| Total equity | 85,000 | 42,487 | 9,787 | (24,762) |
| Total liabilities and equity | $345,205 | $312,437 | $285,611 | $261,388 |

Notes:

(1) Includes approximately $109.6 million of unallocated excess of reorganization value over net assets resulting from certain fresh-start accounting adjustments.

**IWO Holdings, Inc. and Subsidiaries**
Projected Condensed Consolidated Statement of Cash Flows
(in thousands)
(Unaudited)

|  | For the year ending December 31, | | | |
|  | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Cash flows from operating activities: | | | | |
| Net income (loss) | $ 215,607 | $ (42,513) | $ (32,700) | $ (34,549) |
| Plus: depreciation & amortization | 35,147 | 49,675 | 53,274 | 57,134 |
| Less: gain on cancellation of debt and accrued interest | (65,310) | - | - | - |
| Less: fresh start accounting adjustments | (194,583) | - | - | - |
| Less: dispute settlement with Sprint | (15,964) | - | - | - |
| Plus: unrealized loss on sale of assets | 84 | - | - | - |
| Plus: interest income on restricted cash | (0) | (2) | (2) | (2) |
| Plus: accretion of debt discount | 1,691 | - | - | - |
| Plus: amortization of deferred issuance costs | 2,626 | 1,033 | 1,033 | 1,033 |
| Plus: non-cash interest expense | - | 8,625 | 9,617 | 10,723 |
| Plus: net change in working capital | 13,157 | (114) | (3,158) | (1,149) |
| Net cash (used in)/provided by operating activities | (7,546) | 16,705 | 28,064 | 33,190 |
| | | | | |
| Cash flows from investing activities: | | | | |
| Capital expenditures | (17,154) | (20,969) | (21,006) | (23,799) |
| Sale of assets | 159 | - | - | - |
| Net cash used in investing activities | (16,995) | (20,969) | (21,006) | (23,799) |
| | | | | |
| Cash flows from financing activities: | | | | |
| Proceeds of debt issuance | 218,516 | - | - | - |
| Principal repayments | (215,000) | - | - | - |
| Release of restricted cash | 19,279 | - | - | - |
| Net cash provided by/(used in) financing activities | 22,795 | - | - | - |
| | | | | |
| Beginning cash balance | 32,337 | 30,591 | 26,327 | 33,384 |
| Net change in cash | (1,746) | (4,264) | 7,057 | 9,391 |
| Ending cash balance | $ 30,591 | $ 26,327 | $ 33,384 | $ 42,776 |

52

B.    **Valuation**

1.    <u>General</u>

The Debtors have retained Evercore Restructuring, L.P. ("Evercore") as their investment banker to assist the Debtors in connection with their restructuring, including (without limitation) the formulation of the Plan of Reorganization.  In furtherance of the Plan of Reorganization, and in an effort to estimate the percentage of recovery to be received by the holders of the Allowed Claims receiving New Common Stock pursuant to the Plan of Reorganization, the Debtors have requested that Evercore perform a valuation analysis of the Reorganized Debtors.

Estimates of Reorganized IWO's going concern enterprise value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if the Reorganized Debtors were to be sold.  Such estimates were developed solely for purposes of formulation and negotiation of the Plan of Reorganization and analysis of implied relative recoveries to parties-in-interest thereunder.  Such estimates reflect the implied going concern enterprise value of the Reorganized Debtors based upon the terms of the Plan of Reorganization and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan of Reorganization, which may be significantly different from the amounts set forth herein.  The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business.  As a result, the estimate of going concern enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein.  Because such estimates are inherently subject to uncertainties, neither IWO, nor its officers, directors or advisors assume responsibility for their accuracy.

In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holding of pre-petition creditors, some of whom may prefer to liquidate their investment rather than hold them on a long-term basis, and the fact that the securities are not listed on any securities exchange, and other factors that generally influence the prices of securities.  Actual prices of such securities also may be affected by the bankruptcy case or by other factors not possible to predict.  Accordingly, the going concern enterprise value estimated by Evercore does not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

As used in this Section V.B, (a) "Enterprise Value" means Evercore's estimate of the intrinsic value of the Reorganized Debtors at December 31, 2004 as determined as of November 23, 2004 and based upon the assumptions and data identified herein, Evercore's application of various valuation techniques thereto, and Evercore's

53

independent professional judgment and (b) "Reorganized Debtors" means IWO and its other direct and indirect wholly-owned subsidiaries following consummation of the Plan of Reorganization.

In connection with delivering this analysis, Evercore has, among other things: (i) analyzed publicly available financial statements and other publicly available information relating to Debtors; (ii) analyzed certain internal financial statements and other non-public financial and operating data relating to the Debtors; (iii) analyzed public trading prices of the Debtors' publicly-traded securities; (iv) discussed appropriate capital structure requirements with management; (v) discussed the past and current operations, financial Projections and current financial condition of the Debtors with management; (vi) compared the financial performance of the Debtors with the financial performance of a selected group of peer companies, and evaluated the prices and valuation multiples of such peer companies; (vii) searched for precedent merger and acquisition transactions in which IWO believed the target to be similar in some respect to the Debtors; and (viii) performed other examinations and analyses and considered other factors that IWO deemed appropriate.

In preparing its analysis, Evercore assumed and relied upon the accuracy and completeness of all of the financial and other information that was available to it from public sources and that was provided to Evercore by the Debtors or its representatives and has not assumed any responsibility for independent verification of any such information. With respect to the financial Projections supplied to Evercore, Evercore assumed the accuracy thereof and assumed that such Projections were reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Debtors. Such Projections have been prepared and reviewed by management of IWO. Upon consummation of the Plan of Reorganization, US Unwired will no longer manage IWO pursuant to the Management Agreement, and the management currently provided by US Unwired will be replaced by new directors and a new management team. The new management team does not presently work for IWO and has had limited recent involvement with IWO. There can be no guarantee that the new management team of IWO will implement the business plan underlying these Projections or achieve the projected results. In addition, to the extent that all or a portion of IWO's business performs at levels not consistent with those expected in the business plan, any adjustments to the business plan may have a material impact on the operating Projections and valuations as presented herein. Evercore did not make or obtain any independent evaluation of the Debtors' assets, nor did Evercore verify any of the information it reviewed.

With respect to the valuation of the Reorganized Debtors, in addition to the foregoing, Evercore relied upon the following assumptions and/or methodologies:

- The enterprise valuation range indicated assumes the pro forma debt levels (as set forth in the financial Projections included herein) to calculate a range of equity values.

- The Debtors will emerge from chapter 11 on or prior to December 31, 2004.

- The Debtors will be able to obtain all necessary financing, as described elsewhere herein. Evercore has not made and makes no representations as to whether the Debtors will be able to obtain financing or as to the terms upon which such financing may be obtained.

- Amendment of the Sprint Agreements, including the territory build-out requirement set forth therein, and the settlement of disputes between Sprint PCS and the Debtors.

- Successful transition of management services from US Unwired to the new management team and the ability of the new management team to deliver on the projections used to develop this valuation.

As a result of such analyses, reviews, discussions, considerations and assumptions, Evercore estimates that the enterprise value of the Reorganized Debtors falls in a range between approximately $240 million to $320 million and the equity value falls in a range between approximately $45 million to $125 million. These estimated ranges of values represent hypothetical values that reflect the estimated intrinsic value of the Reorganized Debtors derived through the application of various valuation techniques.

**SUCH ANALYSIS DOES NOT PURPORT TO REPRESENT VALUATION LEVELS, PURCHASE PRICES, OR TRADING LEVELS, WHICH WOULD BE ACHIEVED IN, OR ASSIGNED BY, THE CAPITAL MARKETS FOR DEBT AND EQUITY SECURITIES OR IN A SALE OF ALL OR SUBSTANTIALLY ALL OF THE REORGANIZED DEBTORS' ASSETS OR OTHER CHANGE-OF-CONTROL TRANSACTION.**

Evercore's estimate is necessarily based on economic, market, financial and other conditions as they exist on, and on the information made available to it as of, the date of this Disclosure Statement. It should be understood that, although subsequent developments may affect Evercore's conclusions, Evercore does not have any obligation to update, revise or reaffirm its estimate.

2.    Summary of Financial Analyses

The following is a brief summary of certain financial analyses performed by Evercore to arrive at its estimation of the enterprise value and equity value of the Reorganized Debtors. Evercore performed certain procedures, including each of the financial analyses described below, and reviewed with management the assumptions upon which such analyses were based and other factors, including the projected financial results of the Reorganized Debtors.

*Analysis of Certain Publicly Traded Companies.* To provide contextual data and comparative market information, Evercore compared selected projected operating and financial ratios for the Reorganized Debtors to the corresponding data and ratios of a number of selected Sprint PCS affiliate public companies whose securities are publicly

traded and which Evercore believes have operating, market and trading valuations similar in certain respects to what might be expected of the Reorganized Debtors.  Such data and ratios include the enterprise value of such Sprint PCS affiliates as multiples of earnings before interest, taxes, depreciation and amortization (EBITDA) for historical and projected periods.

Although the Sprint PCS affiliates were used for comparison purposes, none of those companies are directly comparable to the Reorganized Debtors. Accordingly, an analysis of the results of such a comparison is not purely mathematical, but instead involves complex considerations and judgments concerning differences in historical and projected financial and operating characteristics of the Sprint PCS affiliates and other factors that could affect the public trading value of the Sprint PCS affiliates or the Reorganized Debtors to which they are being compared.

*Discounted Cash Flow Analysis.*  To provide information with regard to valuation in terms of the future potential cash flows of the Reorganized Debtors, Evercore determined a potential range of enterprise values based on estimated unleveraged free cash flows and terminal enterprise values achieved through the value of the cash flows in perpetuity as provided to Evercore by management.  Using this approach, Evercore derived the present value of such cash flows by discounting the expected cash flows at a rate that reflects the riskiness of the cash flows.  The estimated discount rate is a function of the expected cost of capital of the Reorganized Debtors, based on the estimated cost of capital for the Sprint PCS affiliates and management's expectation of the potential future borrowing costs of the Reorganized Debtors, and has been adjusted to account for the expected capital structure of the Reorganized Debtors.

As the estimated cash flows, estimated discount rate and expected capital structure of the Reorganized Debtors are used to derive a potential value, an analysis of the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors and other factors that could affect the future prospects and cost of capital considerations of the Reorganized Debtors.

The summary set forth above does not purport to be a complete description of the analyses performed by Evercore.  The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description.  In performing its analyses, Evercore and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions and other matters.  The analyses performed by Evercore are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

Evercore relied on the accuracy and reasonableness of the projections and the underlying assumptions as prepared by the Debtors.  Evercore's valuation assumes that operating results projected by the Debtors will be achieved in all material respects, including revenue, operating margins, earnings, cash flow, working capital, expenses and

other elements.  To the extent that the valuation is dependent upon the Reorganized Debtors' achievement of the projections, the valuation must be considered speculative. For purposes of the valuation analysis, Evercore relied on the accuracy and reasonableness of the tax assumptions prepared by the Debtors.  To the extent that any tax assumptions indicate that the restructuring or forgiveness of debt would have a different impact on the operating performance or cash generation of the Debtors than that assumed herein, it may have a material effect on the valuation range included herein.

## VI.

## CERTAIN FACTORS AFFECTING IWO

### A.    Certain Bankruptcy Law Considerations

#### 1.    Failure to Satisfy Vote Requirement

If the holders of Senior Note Claims (Class 4) vote to accept the Plan of Reorganization in accordance with the requirements of the Bankruptcy Code, the Debtors intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan of Reorganization.  Although the Debtors anticipate that sufficient votes will be received to accept the Plan of Reorganization, in the event that sufficient votes are not received, the Debtors may nevertheless file petitions for relief under chapter 11 of the Bankruptcy Code. In such event, the Debtors may seek to accomplish an alternative restructuring of its capitalization and its obligations to creditors.  There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to holders of Senior Note Claims and other creditors as those proposed in the Plan of Reorganization.

#### 2.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan of Reorganization will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan of Reorganization will not be required for confirmation.

#### 3.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  See Section VIII.B below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization."  Because the Plan of Reorganization

57

deems Class 6 (Old Common Stock Interests) to reject the Plan of Reorganization, these requirements must be satisfied with respect to such class.  IWO believes that the Plan of Reorganization satisfies these requirements.

4.      Risk of Non-Occurrence of the Consummation Date

Although IWO believes that the Consummation Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  Moreover, if the conditions precedent to the Consummation Date have not occurred or been waived within six months after the Confirmation Date, the Bankruptcy Court may vacate the Confirmation Order, in which event the Plan of Reorganization would be deemed null and void, and IWO may propose and solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan of Reorganization.

5.      Effect of IWO's Chapter 11 Case on Relations With Customers

The commencement of a chapter 11 case by the Debtors may adversely affect the Debtors' business and their relationship with third parties, as well their ability to attract high quality employees.  For example, the Debtors may have difficulty entering into leases and other agreements related to their operations.  Additionally, although the Debtors believe that they have good relationships with their customers, there can be no assurance that such customers will continue to use their services after the commencement of the Debtors' Reorganization Case.

**B.      Factors Affecting the Value of the Securities to be Issued Under the Plan of Reorganization**

1.      Reliance on Sprint PCS Processing

Under IWO's affiliation agreements with Sprint PCS, Sprint PCS performs, among other things, IWO's billing, customer care and collections, national network systems support, inventory logistics, long distance transport and national third party sales support.  The data provided by Sprint PCS related to these functions they perform for IWO is the primary source for IWO's service revenue and for a significant portion of its cost of service and roaming, and selling and marketing expenses included in its statement of operations.  IWO uses this data to record its financial results and prepare its financial statements.  Based upon the timing of the information received from Sprint PCS, IWO makes certain assumptions that the information is accurate and that it is consistent with historical trends.  If IWO later finds errors in that data provided to it, IWO may be required to restate its financial statements and take other actions that could adversely impact investor confidence.

2.      Capital Requirements

The business of Reorganized IWO is expected to have substantial capital expenditure needs.  IWO's ability to gain access to additional capital, if needed, cannot be assured, particularly in view of competitive factors and industry conditions.

58

3.    New Management

Since the acquisition of IWO Holdings by US Unwired, IWO has not operated under its own senior management and has instead been managed by the senior management of US Unwired.  Upon consummation of the Plan of Reorganization, IWO will have new directors and will be managed by a new management team that does not presently work for IWO and has had limited recent involvement with IWO.  No assurance can be given that IWO's new management team or its new management structure will be successful.

4.    Variances from Projections

The fundamental premise of the Plan of Reorganization is the deleveraging of IWO and the implementation and realization of IWO's business plan, as reflected in the Projections contained in this Disclosure Statement.  The Projections reflect numerous assumptions concerning the anticipated future performance of Reorganized IWO, some of which may not materialize.  Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to establish market strength, consumer purchasing trends and preferences, and the ability to stabilize and grow IWO's sales base and control future operating expenses.  IWO believes that the assumptions underlying the Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of Reorganized IWO.  Additionally, upon the Consummation Date, IWO will have new directors and will be operated by a new management team who may not utilize the same business plans that underlie these projections, and who may not have the ability to successfully implement such business plans, which could have a material adverse impact on IWO's results of operations and financial condition.  Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results, and such variations may be material and adverse.

Moreover, the estimated percentage recovery by holders of allowed claims is based upon IWO's estimate of the value of the New Common Stock.  Because the market and economic conditions upon which such values are based are beyond the control of IWO, the actual results achieved necessarily will vary from the estimate.  Such variations may be material and adverse.

5.    Disruption of Operations

The commencement and pendency of IWO's chapter 11 case could adversely affect IWO's commercial relationships, as well as its ability to retain or attract high-quality employees.  In such event, weakened operating results may occur that could give rise to variances from IWO's projections.

6.    Lack of Trading Market

Pursuant to the Plan of Reorganization, IWO Holdings' common stock will be cancelled and the New Common Stock will not be listed on any nationally recognized

market or exchange.  Accordingly, no assurance can be given that a holder of New Common Stock will be able to sell such securities in the future or as to the price at which any sale may occur.  If a holder of New Common Stock is able to sell such securities in the future, the price of the securities could be higher or lower than the value ascribed to them in this Disclosure Statement, depending upon many factors, including prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, Reorganized IWO.

7.    Dividend Policies

IWO Holdings does not anticipate that any dividends will be paid on the New Common Stock in the foreseeable future.  In addition, the covenants in the New Notes limit Reorganized IWO's ability to pay dividends.

**C.    Certain Tax Matters**

For a summary of certain federal income tax consequences of the Plan of Reorganization to holders of claims and to IWO, see Section XI below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OF REORGANIZATION."

**D.    Pending Litigation or Demands Asserting Prepetition Liability**

As of the date of this Disclosure Statement, there were no pending demands or litigation asserting prepetition liability which IWO believes will have a material adverse effect upon the operations or financial position of IWO, Reorganized IWO or its subsidiaries, if determined unfavorably to IWO.

## VII.

### VOTING PROCEDURES AND REQUIREMENTS

**A.    Voting Deadline**

IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 4 (SENIOR NOTE CLAIMS) TIMELY EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION.  All known holders of Senior Note Claims entitled to vote on the Plan of Reorganization have been sent a Ballot together with this Disclosure Statement.  Such holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement.

The Debtors have engaged Financial Balloting Group LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan of Reorganization.  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW BEFORE THE VOTING DEADLINE OF 5:00 P.M., EASTERN TIME, ON DECEMBER 29, 2004.

**IF YOU MUST RETURN YOUR BALLOT TO YOUR BANK, BROKER OR OTHER NOMINEE, OR TO THEIR AGENT, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN IT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT IWO'S VOTING AGENT AT THE NUMBER SET FORTH BELOW.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OF REORGANIZATION WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

> FINANCIAL BALLOTING GROUP LLC
> 757 THIRD AVENUE, 3RD FLOOR
> NEW YORK, NEW YORK  10017
> **ATTN:  IWO BALLOT TABULATION**
>
> TEL.: (646) 282-1800

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the address set forth immediately above.

**B.      Holders of Claims Entitled to Vote**

Class 4 (Senior Note Claims) is the only class of claims and equity interests under the Plan of Reorganization that are impaired and entitled to vote to accept or reject the Plan of Reorganization.  Each holder in Class 4 (Senior Note Claims) as of November 24, 2004 (the record date established by IWO for purposes of this solicitation) may vote to accept or reject the Plan of Reorganization.

**C.      Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims occurs when holders of at least two-thirds in dollar amount and more than one half in number of the allowed claims of that class that cast ballots for acceptance or rejection of the plan of reorganization vote to accept the plan.  Thus, acceptance of the Plan of Reorganization by Class 4 (Senior Note Claims) will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Senior Note Claims, respectively, that cast their Ballots vote in favor of acceptance.  As noted in the Introduction and Article II hereof, IWO has entered into the Lock Up Agreement with members of the Senior Noteholder Committee who collectively beneficially own approximately 68% of the outstanding Senior Notes.  Pursuant to the terms and conditions of the Lock Up Agreement, each such holder of Senior Notes has agreed to vote to accept the Plan of Reorganization.

61

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

**D.      Voting Procedures**

        1.      <u>Holders of Class 4 (Senior Note Claims)</u>

All record holders of Senior Note Claims in Class 4 should complete the enclosed Ballot and return it to the Voting Agent so that it is received by the Voting Agent before the Voting Deadline.

        2.      <u>Delivery of Old Securities</u>

IWO is not at this time requesting the delivery of, and neither IWO nor the Voting Agent will accept, certificates representing any Senior Notes.

        3.      <u>Withdrawal of Ballot or Master Ballot</u>

Any voter that has delivered a valid Ballot or Master Ballot may withdraw its vote by delivering a written notice of withdrawal to the Voting Agent before the Voting Deadline.  To be valid, the notice of withdrawal must (a) be signed by the party who signed the Ballot or Master Ballot to be revoked, and (b) be received by the Voting Agent before the Voting Deadline.  IWO may contest the validity of any withdrawals.

Any holder that has delivered a valid Ballot or Master Ballot may change its vote by delivering to the Voting Agent a properly completed subsequent Ballot or Master Ballot so as to be received before the Voting Deadline.  In the case where more than one timely, properly completed Ballot or Master Ballot is received, only the Ballot or Master Ballot that bears the latest date will be counted.

**VIII.**

**CONFIRMATION OF THE PLAN OF REORGANIZATION**

**A.      Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As promptly as practicable after the commencement by IWO of its chapter 11 case, IWO will request the Bankruptcy Court to schedule a confirmation hearing.  Notice of the confirmation hearing will be provided to all creditors and equity holders or their representatives.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.  Any objection to confirmation of

the Plan of Reorganization must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of claims or interests held or asserted by the objector against IWO's estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Weil, Gotshal & Manges LLP, Attorneys for IWO, 767 Fifth Avenue, New York, New York 10153, Attention:  Jeffrey L. Tanenbaum, Esq., (ii) Richards, Layton & Finger, P.A., Attorneys for the Debtors, One Rodney Square, P.O. Box 551, Wilmington, Delaware, 19899, Attention: Mark D. Collins, Esq., (iii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attorneys for the Senior Noteholder Committee, Attention:  Andrew N. Rosenberg, Esq., and (iv) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, Attorneys for the Agent, Attention: Harold S. Novikoff, Esq., so as to be received no later than the date and time designated in the notice of the confirmation hearing.

Objections to confirmation of the Plan of Reorganization are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.     Requirements for Confirmation of the Plan of Reorganization**

  1.     Requirements of Section 1129(a) of the Bankruptcy Code

(a)     General Requirements.  At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)     The Plan of Reorganization complies with the applicable provisions of the Bankruptcy Code.

(2)     IWO has complied with the applicable provisions of the Bankruptcy Code.

(3)     The Plan of Reorganization has been proposed in good faith and not by any means proscribed by law.

(4)     Any payment made or promised by IWO or by a Person issuing securities or acquiring property under the Plan of Reorganization for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan of Reorganization and incident to the chapter 11 case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan of Reorganization is reasonable, or if such payment is to be fixed after confirmation of the Plan of Reorganization, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)     IWO has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan of Reorganization, as a director or officer of each Debtor, an affiliate of IWO participating in a Plan of Reorganization with IWO, or a successor to IWO under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and IWO has disclosed the identity of any insider that will be employed or retained by IWO, and the nature of any compensation for such insider.

(6)     With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan of Reorganization or will receive or retain under the Plan of Reorganization on account of such holder's claim or equity interest, property of a value, as of the Consummation Date, that is not less than the amount such holder would receive or retain if IWO were liquidated on the Consummation Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(7)     Except to the extent that the Plan of Reorganization meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan of Reorganization or is not impaired under the Plan of Reorganization.

(8)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan of Reorganization provides that administrative expenses and priority claims, other than priority tax claims, will be paid in full on the Consummation Date and that priority tax claims will receive on account of such claims deferred Cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Consummation Date, equal to the allowed amount of such claims.

(9)     At least one class of impaired claims has accepted the Plan of Reorganization, determined without including any acceptance of the Plan of Reorganization by any insider holding a claim in such class.

(10)     Confirmation of the Plan of Reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of IWO or any successor to IWO under the Plan of Reorganization, unless such liquidation or reorganization is proposed in the Plan of Reorganization.  See discussion of "Feasibility" below.

(11)     The Plan of Reorganization provides for the continuation after the Consummation Date of payment of all Retiree Benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time

64

prior to confirmation of the Plan of Reorganization, for the duration of the period IWO has obligated itself to provide such benefits.

(b)    <u>Best Interests Test</u>.  As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (a) accepts the plan of reorganization or (b) receives or retains under the plan property of a value, as of the Consummation Date, that is not less than the value such holder would receive or retain if IWO were liquidated under chapter 7 of the Bankruptcy Code on the Consummation Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of IWO's assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash available would be the sum of the proceeds from the disposition of IWO's assets and the Cash held by IWO at the time of the commencement of the chapter 7 case.  The next step, however, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of IWO's business and the use of chapter 7 for the purposes of liquidation.  Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below).  Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan of Reorganization on the Consummation Date.

IWO's costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by IWO during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed.  Moreover, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by IWO both prior to, and during the pendency of, the chapter 11 case.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest.  IWO believes that in a chapter 7 case, holders of Senior Notes, General Unsecured Claims, and Old Common Stock Interests would receive no distributions of property.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion

in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, IWO has determined that confirmation of the Plan of Reorganization will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of IWO under chapter 7 of the Bankruptcy Code.

Moreover, IWO believes that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan of Reorganization because such distributions in a chapter 7 case may not occur for a substantial period of time.  In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions.  In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**IWO's liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of IWO. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of IWO's assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

(c)     Liquidation Analysis.  IWO's chapter 7 liquidation analysis and assumptions are set forth below:

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Allowed Claim or Equity Interest either (a) accept the plan of reorganization or (b) receive or retain under such plan property of a value, as of the consummation date of the plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the consummation date of the plan.

The purpose of the Liquidation Analysis that follows is to provide information in order for the Bankruptcy Court to determine that the Plan of Reorganization satisfies this requirement.  The Liquidation Analysis was prepared to assist the Bankruptcy Court in making this determination and should not be used for any other purpose.

The following presents the general assumptions that were used in preparing the Liquidation Analysis assuming a chapter 7 case in which a chapter 7 trustee is charged with reducing to cash any and all assets of the Debtors and making distributions to the holders of Allowed Claims and Equity Interests in accordance with the distributive provisions of section 726 of the Bankruptcy Code.

Conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code would likely result in additional costs to the estates.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee as

well as professionals retained by the trustee, asset disposition expenses (including broker fees and other commissions), personnel costs, and costs and expenses associated with preserving and protecting the Debtors' assets during the liquidation period.

The Liquidation Analysis is limited to presenting information provided by management and does not include an independent evaluation of the underlying assumptions.  The Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.  The estimates and assumptions, although considered reasonable by management, are inherently subject to significant uncertainties and contingencies beyond the control of management.  Accordingly, there can be no assurance that the results shown would be realized if the Debtors were liquidated, and actual results in such case could vary materially from those presented.  If actual results are different from those shown, or if the assumptions used in formulating the Liquidation Analysis were not realized, then distributions to and recoveries by holders of Allowed Claims and Equity Interests would be materially affected.

In addition, the actual amounts of claims against the Debtors' estates could vary significantly from estimated amounts depending upon the claims asserted during the pendency of the chapter 7 case, by reason of, among other things, the breach or rejection of executory contracts and leases.  The Liquidation Analysis does not include liabilities that may arise as a result of litigation, certain new tax assessments, or other potential claims.  The Liquidation Analysis also does not include recoveries from potential avoidance actions.  For the foregoing reasons and others, the Liquidation Analysis is not necessarily indicative of the values that may be realized in an actual liquidation, which values could vary materially from the estimates provided herein.

The Liquidation Analysis, which was prepared by the Debtors in consultation with their financial and legal advisers, is based upon a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and management. The Liquidation Analysis is based upon assumptions with regard to liquidation decisions that would be made by the trustee (not management) and that are subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized by the Debtors were they, in fact, to undergo such a liquidation.

*General Assumptions*

(1)    The Liquidation Analysis is based upon an estimate of the proceeds that would be realized by the Debtors in the event that the Debtors' assets are liquidated under chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is based upon projected balance sheets as of December 31, 2004.  Management of the Debtors does not believe that historical information or future projected information would vary significantly.  However, this analysis is subject to change as a result of any changes in the Debtors' operations.

(2)     The chapter 7 liquidation period is assumed to be 3 months following the appointment or election of a chapter 7 trustee.  The collection of receivables and the marketing and sale of property, plant and equipment are assumed to be completed by the end of the third month.  It is assumed that no services would be provided to the Debtors' customers during the liquidation period and the wind-down of business operations of the Debtors will occur during the 3 months.  The wind-down costs have been estimated by the Debtors' management and any deviation from this assumed period could have a material impact on the wind-down costs, the amount of administrative claims, proceeds from asset sales and the ultimate recovery to the creditors of the Debtors' estates.

(3)     All distributions will be made as and when proceeds from the disposition of assets and collection of receivables are received; however, the projected recoveries have not been discounted to reflect the present value of any distributions.

(4)     The claim amounts reflected in the Liquidation Analysis were estimated based upon a review of the Debtors' balance sheets as of September 30, 2004 and estimates of claims that would arise in the event the Debtors' cases were converted to cases under chapter 7 of the Bankruptcy Code.  The actual amount of claims allowed will change as a result of the resolution of various disputed, contingent, or unliquidated claims that have been or may be filed with the Bankruptcy Court.

(5)     Management believes that it is unlikely that any taxable gains would be triggered through a liquidation of the Debtors' assets.  However, if for some reason there were to be a taxable gain from the liquidation of the Debtors' assets, any realized gains would be offset by the Debtors' current pretax losses and/or net operating loss carryforwards with minimal or no tax liability resulting.

(6)     The Liquidation Analysis does not assume the sale of the Debtors' assets or any portion thereof on a going concern basis.  As a result, the values reflected in the Liquidation Analysis are not indicative of the values that might be received were the Debtors to sell any of their assets as a going concern separately or as a whole.  The values reflected in the Liquidation Analysis are based solely on the assumption that the Debtors pursue a pure liquidation under chapter 7 of the Bankruptcy Code.

Notes to Liquidation Analysis

The notes below identify and describe the significant assumptions that are incorporated in the Liquidation Analysis:

(1)     The Debtors' estimated Cash and Cash Equivalents as of the liquidation date is approximately $39.1 million.  In liquidation, the estimated recovery on the balance of Cash and Cash Equivalents is 100%.

(2)     The Debtors' Accounts Receivables are primarily comprised of amounts owed by their customers. The Debtors' management believes that liquidation would have a significant impact on collections of Accounts Receivables.  An estimated recovery percentage has been assigned to each category of receivable. The estimated recovery percentage on receivables is approximately 4% to 13% .

(3)     Inventories consist primarily of wireless handsets and accessories.  The estimated recovery percentage on inventories is estimated to be between 50% and 70%.

(4)     Prepaid and Other Current Assets consist primarily of prepaid rent, prepaid insurance and restructuring fee retainers.  No recovery is estimated from the liquidation of these assets.

(5)     Property and Equipment consist primarily of cell site and switching equipment, leasehold improvements, hardware and software, furniture, office equipment and certain buildings and vehicles.  Leasehold improvements and software were ascribed no value. The recoveries for cell site and switching equipment were based on management's "gray market" value estimates, and ranged from $13.2 million to $34.8 million. The recovery of office equipment and furniture is estimated to be 10% to 15% of gross value; the recovery of buildings is estimated to be $700,000 to $900,000 and the recovery for vehicles is estimated to be 25% to 40% of gross value.

(6)     Intangible Assets consist primarily of goodwill, customer relationships and deferred financing costs. No recovery is estimated from the liquidation of these assets.

(7)     Other Assets include deferred activation costs and surety bond collateral.  The recovery of surety bond collateral is estimated to be between 90% and 100%.  No recovery is estimated from the liquidation of deferred activation costs.

(8)     Wind-down expenses include costs associated with the liquidation of assets after notification of wind-down to customers and include certain field employee salary and severance payments, certain real estate leases, management fees and insurance costs.

(9)     Trustee fees are projected to be approximately 3% of gross liquidation proceeds in accordance with section 326 of the Bankruptcy Code.

(10)    Professional fees represent the costs of a chapter 7 case for attorneys, accountants, appraisers and other professionals retained by the chapter 7 trustee. Fee estimates were based upon management's review of the nature of these costs.

(11)    The payment of expenses was assumed to take place throughout the 3-month liquidation period as and when proceeds from the disposition of assets and collection of receivables occur.  No interest income is assumed to be earned on the net liquidation proceeds.

(12)    Secured Claims consist of the Secured Revolver, the Secured Term Loan A and the Secured Term Loan B.

(13)    Accrued expenses include amounts associated with disputes with Sprint PCS regarding certain charges billed by Sprint PCS.

69

**IWO HOLDINGS, INC AND SUBSIDIARIES**
**PRELIMINARY LIQUIDATION SCENARIO**
**($ IN MILLIONS)**

## I. STATEMENT OF ASSETS

| | Projected Book Value 12/31/04 | Hypothetical Recovery Percentage | | Estimated Liquidation Value (Unaudited) | |
|---|---|---|---|---|---|
| | (Unaudited) | Low | High | Low | High |
| Current Assets: | | | | | |
| Cash & Cash Equivalents | $39.1 | 100% | 100% | 39.1 | 39.1 |
| Subscriber Receivables, Net | 10.9 | 4% | 13% | 0.5 | 1.5 |
| Inventory | 2.1 | 50% | 70% | 1.0 | 1.4 |
| Prepaid Expenses and Other Current Assets | 8.0 | 0% | 0% | 0.0 | 0.0 |
| Total Current Assets | $60.1 | 68% | 70% | $40.6 | $42.0 |
| Long Term Assets: | | | | | |
| Property & Equipment, gross | $224.4 | 6% | 16% | $14.5 | $36.7 |
| Intangible Assets, gross | 38.3 | 0% | 0% | 0.0 | 0.0 |
| Other Assets | 2.2 | 66% | 74% | 1.4 | 1.6 |
| Total Long Term Assets | $264.9 | 6% | 14% | $15.9 | $38.3 |
| **Gross Estimated Proceeds Available for Distribution** | **$325.0** | **17.4%** | **24.7%** | **$56.5** | **$80.2** |
| Less: | | | | | |
| Wind Down Expenses | | | | (4.8) | (4.8) |
| **Total Proceeds Available for Distribution** | | | | **$51.7** | **$75.4** |

## II. DISTRIBUTION OF PROCEEDS

| | Projected Book Value 12/31/04 | | Estimated Liquidation Value (Unaudited) | |
|---|---|---|---|---|
| | (Unaudited) | | Low | High |
| Adminstrative and Priority Claims | | | | |
| Professional Fees | | | $2.5 | $2.5 |
| Trustee Fees | | | 1.7 | 2.4 |
| Total Admistrative and Priority Claims | | | $4.2 | $4.9 |
| Proceeds Available for payment of secured claims | | | $47.5 | $70.5 |
| Secured Claims | | | | |
| Secured Bank Debt | $215.0 | | $47.5 | $70.5 |
| Total Secured Claims | 215.0 | | 47.5 | 70.5 |
| Proceeds Available for payment of unsecured claims | | | $0.0 | $0.0 |
| Unsecured Claims | | | | |
| Senior Notes (1) | $181.5 | | $0.0 | $0.0 |
| Accounts Payable | 23.3 | | 0.0 | 0.0 |
| Accrued Expenses | 27.4 | | 0.0 | 0.0 |
| US Unwired Termination Fee | 2.5 | | 0.0 | 0.0 |
| Total Unsecured Claims | $234.6 | | $0.0 | $0.0 |
| Proceeds Available for distribution to Common Stock | | | $0.0 | $0.0 |

(1) Includes $160 million of principal amount and $21.5 million of accrued interest from last payment on January 15, 2004.

(d)    <u>Feasibility</u>.  The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan of Reorganization meets this requirement, IWO has analyzed its ability to meet its obligations as contemplated thereunder.  As part of this analysis, IWO has prepared the projections contained in Section V above, entitled "PROJECTIONS AND VALUATION ANALYSIS."  These projections are based upon the assumption that the Plan of Reorganization will be confirmed by the Bankruptcy Court and, for projection purposes, that the Consummation Date of the Plan of Reorganization and its substantial consummation will take place on or about December 31, 2004.  The projections include balance sheets, statements of operations and statements of cash flows.  Based upon the projections, IWO believes it will be able to make all payments required to be made pursuant to the Plan of Reorganization.

2.    <u>Requirements of Section 1129(b) of the Bankruptcy Code</u>

The Bankruptcy Court may confirm the Plan of Reorganization over the rejection or deemed rejection of the Plan of Reorganization by a class of claims or equity interests if the Plan of Reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination*.  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

*Fair and Equitable Test*.  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

*Secured Claims*.  Each holder of an impaired secured claim either (i) retains its liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred Cash payments having a value, as of the consummation date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

*Unsecured Claims*.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

*Equity Interests*.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the

71

stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

IWO believes the Plan of Reorganization will satisfy the "fair and equitable" requirement notwithstanding that Class 6 (Old Common Stock Interests) is deemed to reject the Plan of Reorganization because, as to Class 6, no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

      3.      Reservation of "Cram Down" Rights

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan of reorganization over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors reserve the right to seek confirmation of the Plan of Reorganization, notwithstanding the rejection of the Plan of Reorganization by any Class entitled to vote. In the event a Class votes to reject the Plan of Reorganization, the Debtors will request the Bankruptcy Court to rule that the Plan of Reorganization meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such Class. The Debtors will also seek such a ruling with respect to each Class that is deemed to reject the Plan of Reorganization.

## IX.

## FINANCIAL INFORMATION

## A.      General

The audited consolidated balance sheets as of December 31, 2003 and December 31, 2002 and the related consolidated statements of operations and cash flows for the year ended December 31, 2003, for the periods from April 1, 2002 through December 31, 2002 and January 1, 2002 through March 31, 2002 and for the year ended December 31, 2001 of IWO Holdings and its subsidiaries are contained in Item 8 – "Financial Statements and Supplementary Data" in IWO Holdings' Annual Report on Form 10-K for the fiscal year ended December 31, 2003, a copy of which is annexed as Exhibit 3 to this Disclosure Statement, and the full text of which is incorporated herein by reference. This financial information is provided to permit the holders of claims and equity interests to better understand IWO's historical business performance and the impact of the Reorganization Case on IWO's business.

B.      **Selected Financial Data**

        See Item 6 – "Selected Financial Data" set forth in the Annual Report on Form 10-K for the fiscal year ended December 31, 2003 annexed as Exhibit 3 to this Disclosure Statement.

C.      **Management's Discussion and Analysis of Financial
        Condition and Results of Operations**

        For a detailed discussion by management of IWO's financial condition, results of operations, and liquidity and capital resources, see Item 7 – "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Annual Report on Form 10-K for the fiscal year ended December 31, 2003 annexed as Exhibit 3 to this Disclosure Statement.

D.      **Recent Performance**

        See IWO Holdings' Quarterly Report on Form 10-Q for the quarter ended September 30, 2004 annexed as Exhibit 4 to this Disclosure Statement.

**X.**

**ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF THE PLAN OF REORGANIZATION**

        If the Plan of Reorganization is not confirmed and consummated, the alternatives to the Plan of Reorganization include (i) liquidation of IWO under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

A.      **Liquidation Under Chapter 7**

        If no plan can be confirmed, IWO's chapter 11 case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of IWO for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and IWO's liquidation analysis are set forth in Section VIII.B.1(b) above, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization -- Best Interests Test."  IWO believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan of Reorganization because of (a) the likelihood that the assets of IWO would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (b) additional administrative expenses involved in the appointment of a trustee and (c) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of IWO's operations.  In a chapter 7 liquidation, IWO believes that there would be no distribution to

73

the holders of Senior Note Claims, General Unsecured Claims or the holders of Equity
Interests.

**B.    Alternative Plan of Reorganization**

If the Plan of Reorganization is not confirmed, IWO (or if IWO's exclusive
period in which to file a plan of reorganization has expired, any other party in interest)
could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan of
reorganization might involve either a reorganization and continuation of IWO's business
or an orderly liquidation of its assets under chapter 11.  With respect to an alternative plan,
IWO has explored various alternatives in connection with the formulation and
development of the Plan of Reorganization.  IWO believes that the Plan of Reorganization,
as described herein, enables creditors and equity holders to realize the most value under
the circumstances.  In a liquidation under chapter 11, IWO's assets would be sold in an
orderly fashion over a more extended period of time than in a liquidation under chapter 7,
possibly resulting in somewhat greater (but indeterminate) recoveries than would be
obtained in chapter 7.  Further, if a trustee were not appointed, because such appointment
is not required in a chapter 11 case, the expenses for professional fees would most likely
be lower than those incurred in a chapter 7 case.  Although preferable to a chapter 7
liquidation, IWO believes that any alternative liquidation under chapter 11 is a much less
attractive alternative to creditors than the Plan of Reorganization because of the greater
return provided by the Plan of Reorganization.

## XI.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES
## OF THE PLAN OF REORGANIZATION

The following discussion summarizes certain U.S. federal income tax
consequences of the implementation of the Plan of Reorganization to the Debtors and
certain holders of Claims.  The following summary does not address the U.S. federal
income tax consequences to holders of Claims whose Claims are unimpaired (*i.e.*, holders
of Priority Non-Tax Claims, Secured Credit Agreement Claims, Other Secured Claims and
General Unsecured Claims) or holders whose interests are extinguished without a
distribution in exchange therefor (*i.e.*, holders of Old Common Stock Interests).

The following summary is based on the Internal Revenue Code of 1986, as
amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial
decisions, and published administrative rules and pronouncements of the Internal Revenue
Service (the "IRS"), all as in effect on the date hereof.  Changes in such rules or new
interpretations thereof may have retroactive effect and could significantly affect the U.S.
federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan of Reorganization
are complex and are subject to significant uncertainties.  The Debtors have not requested a
ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the
Plan of Reorganization.  Thus, no assurance can be given as to the interpretation that the

74

IRS will adopt.  In addition, this summary does not address foreign, state or local tax consequences of the Plan of Reorganization, nor does it purport to address the U.S. federal income tax consequences of the Plan of Reorganization to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding a Claim as part of a hedging, integrated constructive sale or straddle and investors in pass-through entities).  This summary also does not address any tax consequences to secondary purchasers of New Common Stock.

This discussion assumes that the various debt and other arrangements to which a Debtor is a party will be respected for federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, FOREIGN, STATE, LOCAL AND OTHER TAX CONSEQUENCES TO THEM AS A RESULT OF THE PLAN OF REORGANIZATION.**

## A.     Consequences to IWO

For federal income tax purposes, the Debtors are members of an affiliated group of which US Unwired is the common parent (the "US Unwired Group") and join in the filing of a consolidated federal income tax return.  IWO reported consolidated net operating loss (NOL) carryforwards for federal income tax purposes of approximately $340 million as of December 31, 2003 (a portion of which is subject to certain existing limitations), exclusive of any consolidated NOL carryforwards allocable to the other members of the US Unwired Group.  The amount and availability of such loss carryforwards (including the existence and extent of any applicable limitations) remain subject to audit by the Internal Revenue Service.  The Debtors expect to incur, and it is the Debtors' understanding that the US Unwired Group expects to incur, additional losses during the taxable year ending December 31, 2004.

As discussed below, in connection with the implementation of the Plan of Reorganization, the amount of the Debtors' NOL carryforwards (and possibly certain other tax attributes) will be significantly reduced.  Moreover, the Debtors' subsequent utilization of any losses and NOL carryforwards remaining may be severely restricted following the Consummation Date.  Accordingly, IWO is only expected to use a portion of any losses and NOL carryforwards remaining following the implementation of the Plan of Reorganization.

1.    <u>Cancellation of Debt</u>

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets – by the amount of any cancellation of debt ("COD"). Where the debtor joins in the filing of a consolidated federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtors and other members of the group also be reduced. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor. Certain statutory or judicial exceptions can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). Any reduction in tax attributes as a result of COD does not effectively occur until the first day of the taxable year following the taxable year in which the COD is incurred and, consequently, any resulting COD does not impair the debtor's ability to use its tax attributes (to the extent otherwise available) to reduce its tax liability, if any, otherwise resulting from the implementation of the plan. In addition, to the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD has no further effect for U.S. federal tax purposes. If advantageous, a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes.

As a result of the discharge of Claims pursuant to the Plan of Reorganization, the Debtor will suffer significant COD and potential tax attribute reduction. The extent of such COD and resulting tax attribute reduction will depend, in part, on the value of the New Common Stock distributed. Based on the estimated reorganization value of Reorganized IWO (see Section V), it is anticipated that the Debtors will incur approximately $97 million of COD, with an associated reduction in the tax attributes of the Reorganized Debtors, particularly their current year NOLs and NOL carryforwards.

2.    <u>Limitation on NOL Carryforwards and Other Tax Attributes</u>

Following the implementation of the Plan of Reorganization, any remaining NOL, capital loss and tax credit carryforwards and, possibly, certain other tax attributes (including current year NOLs) of the Reorganized Debtors allocable to periods prior to the Consummation Date (collectively, "pre-change losses") may be subject to limitation under section 382 of the Tax Code as a result of the change in ownership of Reorganized IWO. These limitations apply in addition to, and not in lieu of, the attribute reduction that results from the discharge of claims pursuant to the Plan of Reorganization.

Under section 382, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. Such limitation also may apply to certain losses or deductions that are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized.

The issuance of the New Common Stock to holders of Senior Note Claims pursuant to the Plan of Reorganization will constitute an "ownership change" of Reorganized IWO Holdings.

(a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation (or a consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the parent corporation) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.27% for ownership changes occurring during December 2004). For a corporation (or a consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change, after giving effect to the surrender of creditors' claims.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

(b)    Built-In Gains and Losses

As indicated above, section 382 can operate to limit the deductibility of built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance.

Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that joined the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. Thus, a consolidated group can be considered to have both a net unrealized built-in loss and a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed

to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Due to certain factual and interpretational issues, it is unclear whether the Debtors will be in a net unrealized built-in gain position or a net unrealized built-in loss position on the Consummation Date.

(c)     Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the consummation date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change against future taxable income.

The Debtors do not anticipate the ownership changes that will occur pursuant to the Plan of Reorganization will qualify for this exception due to the extent of trading in and accumulation of Claims that has occurred over the last eighteen (18) months. In addition, neither the statute nor the regulations address whether this exception can be applied on a consolidated basis or only on a separate company basis. Even if the Debtors qualify for this exception, the Debtors may, if they so desire, elect not to have the exception apply and instead remain subject to the annual limitation described above. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year in which the change occurs.

3.     Alternative Minimum Tax

In general, a U.S. federal alternative minimum tax ("AMT") is imposed on a corporation's U.S. alternative minimum taxable income at a 20% tax rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its

assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. It is not entirely clear whether this provision would apply even if the Debtors otherwise qualify for, and avail themselves of, the special bankruptcy exception to the annual limitation rules of section 382 discussed in the preceding section.

Any AMT that a U.S. corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### 4.    Nondeductibility of Interest on the Senior Discount Notes

The Senior Discount Notes will be issued with original issue discount ("OID") and are expected to constitute "applicable high yield discount obligations" within the meaning of section 163(e)(5) of the Tax Code. In such event, Reorganized IWO Holding's interest deduction with respect to any OID relating to the Senior Discount Notes will be disallowed to the extent the yield to maturity on the debt instrument exceeds six percentage points over the applicable federal rate for obligations of similar maturity (4.63% for obligations issued in December 2004), and any remaining interest deductions will be deferred until paid in Cash.

### 5.    Possible Conversion of IWO Corp. into a Limited Liability Company

In connection with the implementation of the Plan of Reorganization, the Debtors may, in their discretion, convert IWO Corp. from a corporation to a limited liability company. Should the Debtors choose to effectuate any such conversion, the Debtors intend to do so in a manner that would not have material adverse tax consequences to the Debtors.

## B.    Consequences to Holders of Senior Note Claims

Pursuant to and in accordance with the Plan of Reorganization, holders of Allowed Senior Note Claims will receive New Common Stock in satisfaction of their Claims.

### 1.    Recapitalization Transaction

The U.S. federal income tax consequences of the Plan of Reorganization to holders of Allowed Senior Note Claims depend, in part, on whether such Claims constitute "securities" of IWO for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations promulgated thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" generally depends on an overall evaluation of the nature of the original debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less (e.g., trade debt and revolving credit obligations) do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. The following

discussion assumes that the Senior Note Claims (which have an approximately ten year term) constitute "securities" of IWO.

Accordingly, the distribution of New Common Stock in exchange for an Allowed Senior Note Claim will constitute a tax-free "recapitalization" for federal income tax purposes.  Thus, a holder of a Senior Note Claim generally will not recognize gain or loss upon such exchange.  For a discussion of the tax consequences of any accrued but unpaid interest, see subsection XI.B.2 below, entitled "Distributions in Discharge of Accrued But Unpaid Interest."

In general, a holder's aggregate tax basis in any New Common Stock received in satisfaction of an Allowed Senior Note Claim will equal the holder's aggregate adjusted tax basis in its Claim (including any Claim for accrued but unpaid interest) increased by any interest income recognized in respect of its Claim and decreased by any deductions claimed in respect of any previously accrued interest.  In general, the holder's holding period for the New Common Stock received will include the holder's holding period for the Claim except to the extent issued in respect of a Claim for accrued but unpaid interest (which will begin the day following the receipt of such stock).

    2.    <u>Distributions in Discharge of Accrued but Unpaid Interest</u>

Pursuant to the Plan of Reorganization, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for federal income tax purposes and, thereafter, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  Accordingly, the extent to which any amounts received by holders of Senior Note Claims will be allocated to any accrued but unpaid interest for federal income tax purposes is unclear.

In general, to the extent that any amount received by a holder of an Allowed Claim (whether Cash, stock, or other consideration) is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder is urged to consult its tax advisor with respect to the allocation of amounts received between the principal and interest portions of its Claim.

    3.    <u>Ownership and Disposition of New Common Stock</u>

Any gain recognized by a holder of New Common Stock upon a subsequent taxable disposition of such stock (or any stock or property received for it in a later tax-free exchange) will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect to the Claim for which stock was received and any ordinary loss deductions incurred upon satisfaction of the Claim, less any income (other than interest income)

recognized by the holder upon satisfaction of the Claim, and (ii) with respect to a Cash basis holder, any amount that would have been included in its gross income if the holder's Claim had been satisfied in full but that was not included by reason of the Cash method of accounting.

A holder of a Senior Note Claim may be required to treat all or a portion of any gain recognized as ordinary income under the market discount provisions of the Tax Code.  In addition, the Treasury Department is expected to promulgate regulations that will provide that any accrued market discount not treated as ordinary income upon a tax-free exchange (including a tax-free recapitalization) of market discount bonds would carry over to the nonrecognition property received in the exchange.  If such regulations are promulgated and applicable to the Plan of Reorganization (and, likely, even without the issuance of regulations), any holder of a Senior Note Claim that constitutes a "security" of the Debtor for federal income tax purposes would carry over any accrued market discount to any New Common Stock received pursuant to the Plan of Reorganization, such that any gain recognized by the holder upon a subsequent disposition of such stock also would be treated as ordinary income to the extent of any such accrued market discount not previously included in income.  In general, a Claim will have "accrued market discount" if such Claim was acquired after its original issuance to its adjusted issue price.

## C.      Information Reporting and Withholding

All distributions to holders of Claims under the Plan of Reorganization are subject to any applicable withholding (including employment tax withholding). Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, the following:  (1) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds; and (2) certain transactions in which the taxpayer's book-tax differences exceed a specified threshold in any tax year.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan of Reorganization would be subject to these regulations and require disclosure on the holders' tax returns.

81

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN OF REORGANIZATION.**

**CONCLUSION**

IWO believes that confirmation and implementation of the Plan of Reorganization is in the best interests of the holders of Senior Notes, the Lenders and holders of General Unsecured Claims and urges holders of Senior Note Claims entitled to vote on the Plan of Reorganization to vote to accept the Plan of Reorganization and to evidence such acceptance by returning their Ballots so that they will be received by the Voting Agent no later than 5:00 p.m., Eastern Time, on December 29, 2004.

Dated: December 1, 2004

Respectfully submitted,

IWO HOLDINGS, INC.
INDEPENDENT WIRELESS ONE
   CORPORATION
INDEPENDENT WIRELESS ONE
   LEASED REALTY CORPORATION


By:  /s/ James J. Loughlin, Jr.
Name:  James J. Loughlin, Jr.
Title:   Chief Restructuring Officer

COUNSEL:


/s/ Jeffrey L. Tanenbaum
Jeffrey L. Tanenbaum, Esq. (JT 9797)
Weil, Gotshal & Manges LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York  10153

(212) 310-8000